PEOPLE *v*. ROZEWICZ.

1. WITNESSES—IRRESPONSIVE ANSWER INSUFFICIENT TO CALL MIS-
   TRIAL.
   In a prosecution for larceny, the trial court was not in
   error in refusing to call a mistrial because a police officer,
   on being asked whether he had any conversation with de-
   fendant subsequent to the date of his arrest, gave the ir-
   responsive answer, "I have had him locked up before,"
   where the court immediately ordered it stricken from the
   record, and no request was ever made that the court in-
   struct the jury in regard thereto.

2. SAME.
   Error cannot be predicated upon the fact that a witness
   gave an improper or irresponsive answer where the ques-
   tion was a proper one and neither the court nor examin-
   ing counsel was at fault.

3. CRIMINAL LAW — LARCENY — EVIDENCE — PRODUCTION OF BANK
   BOOK PROPERLY IDENTIFIED NOT ERROR ALTHOUGH NOT PUT IN
   EVIDENCE.
   In a prosecution for the larceny of a sum of money, the
   production and marking of bank books found on defend-
   ant and examining a witness in regard to conversations
   with defendant as to amounts shown therein to have been
   deposited, *held*, not prejudicial error, where they were
   properly identified and proven as his by defendant's own
   statements, and either side could have put them in evi-
   dence, and defendant testified that he did not steal the
   money represented thereby.

Error to recorder's court of Detroit; Faust (John),
J.    Submitted June 13, 1924.    (Docket No. 97.)
Decided July 24, 1924.

Joseph Rozewicz was convicted of larceny, and
sentenced to imprisonment for not less than 2½ nor

more than 5 years in the State prison at Jackson. Affirmed.

*Chawke & Sloan* and *Emory Monash,* for appellant.

*Andrew B. Dougherty,* Attorney General, *Paul W. Voorhies,* Prosecuting Attorney, and *W. Gomer Krise,* Assistant Prosecuting Attorney, for the people.

STEERE, J. Defendant was convicted in the Detroit recorder's court of stealing $2,900 from his mother, Rose Rozewicz, who lived at 4848 Rivard street in said city. Her family, of which she figures as the titular head, consisted of her husband, four sons, including defendant, and a daughter. Defendant was about 29 years of age, her next eldest son being 17. Unknown to the members of her family, as she supposed, Mrs. Rozewicz had for several years been in the habit of concealing money in a caged-off room in the cellar of their home, her hiding place being in a small wooden box stored overhead between some joist so high that it was necessary to get upon something to reach it. She testified that she had thus hid in that box $2,900 in $50 and $100 bills. She had last examined it about two weeks before October 12, 1922, on which date it is claimed defendant stole it. Her story of the circumstances resulting in that charge is, briefly stated, as follows: The stairway to their cellar leads down from the kitchen. On October 12, 1922, she was suffering with a severe headache and lying down in a bedroom opening off from the kitchen when she saw defendant go down cellar, where he remained about 15 minutes. While he was down there she heard a boiler, which was on the cellar floor just below where her money was secreted, rattle. She did not suspect anything wrong of him at that time but remembered that after coming up from the cellar he changed his clothes and went out. He did not come home that night, or later. She testified:

"I did not see him since.   *   *   *   This is the first time I have seen Joseph since that day.   *   *   *   He did not say anything to me about leaving my house or about moving to some place else.    When he did not come back that night it kind of struck me, and the following morning I went down cellar to see if the money was there.    It was not there, and then I went down to the police station."

On cross-examination she said of the noise she heard when he was in the cellar,—

"I did not go down to the basement to find what this was about because I had an awful headache.    I did not suspect him right then, only the following day I went down and I knew that he took it."

Defendant was arrested on June 7, 1923, in front of a near-beer saloon at the corner of Piquette and St. Aubin avenues, by a policeman named Stephen Jezierski who was at the police station on October 13, 1922, when Mrs. Rozewicz made her complaint. He testified that he knew both defendant and his mother.    She was crying and he talked with her in the Polish language about her charge against him and told her he would try to help her if he found defendant; that when he first met and just before arresting him he asked him "what he did with the money he took on his mother?" and he replied that "it belonged to him, that the money was supposed to be his because they cheated him out of it."    Asked whether he had "any conversation with defendant subsequent to that date,—since the date of the arrest?" he replied, "I have had him locked up before."    The trial judge immediately interposed and said:    "That answer may be stricken from the record in this case. It is not responsive to the question."    Defendant's counsel then said, "I think it is highly prejudicial.    I think it is so highly unfair that your honor should call it a mistrial in this case."    The court declined to do so and the trial proceeded.    No request was

made then or later that the court instruct or specifically caution the jury in regard to that incident.

Refusal of the court to call it a mistrial and discharge the jury is urged as reversible error. Defendant's counsel contend that striking the irresponsive and claimed prejudicial answer from the record could not eradicate its damaging effect from the minds of the jury and the ruling that the trial proceed "forced defendant to take the stand to show the character of the offense for which he had been convicted." The irresponsive answer which the court of its own motion struck out did not show that defendant was ever convicted of any offense. He voluntarily took the stand as a witness in his own behalf, not to show the character of the offense of which he had been convicted, but to show that he was not guilty of the offense with which he was charged. No reference was made either on his direct or cross-examination to the stricken out, irresponsive answer of the officer that he "had him locked up before." Only near the close of his cross-examination did defendant state in reply to questions by the prosecutor that in 1920 he was arrested and convicted for carrying a concealed weapon and released on parole. Had he not voluntarily taken the stand even that could not have been shown.

Error cannot be predicated upon the fact that a witness gave an improper or irresponsive answer where the question was a proper one and neither the court nor examining counsel was at fault. *Lynds* v. *Town of Plymouth,* 73 Vt. 216 (50 Atl. 1083) ; *Holman* v. *Edson,* 81 Vt. 49 (69 Atl. 143) ; *People* v. *Mead,* 50 Mich. 228. In the latter case, as here, the trial judge without waiting for an objection ordered what was said by the witness, beyond a simple answer to the question, stricken out. This court, through Justice COOLEY, there said:

"A witness cannot put error into a case by an un-

authorized remark, neither called out by a question nor sanctioned by the judge; and if what he says or does improperly is likely to do much mischief, it is presumed the judge will apply the proper corrective in his instructions if requested to do so.   In this case he applied it on the instant, so far as ruling out the improper statement could do so; and no doubt he would have given specific caution to the jury if requested."

When defendant was arrested he had with him two bank books which the policeman who arrested him turned over to a detective of the city police department named George Nyman.   The latter observed that these books indicated defendant had quite a large sum of money on deposit with the banks and the next morning when he saw him at the police station he asked him about them and defendant said they were his.   Nyman then asked him about the amounts they showed and where he got the money, and he said he earned it working for the Cadillac Motor Company. When his counsel objected to testimony as to entries made in the books they were marked for identification by direction of the court, and the prosecutor, in reply to an inquiry by the court if he intended to put them in evidence, said that he merely wanted the conversation that the witness had with defendant.   He was permitted to proceed and the witness testified in part as follows:

"I read off the amounts to him in the bank books and asked him where he got the $500 one day, and $900 another day—and it is only a matter of a day or two, three or four days apart.

"*Q.* What did he say to that, if anything?

"*A.* He said, 'I don't know.   I worked for the Cadillac Motor Car Company and put the money in.' So finally I said to him, 'On February the 16th you had $2,000 in one bank book, and you switched off to the Wayne County and Home and put $500 there four days after.   How did you happen to do that?'   'Well,' he said—he would have nothing to say to me.   He would not talk any more about it.   *   *   *   I know that de-

fendant himself told me that these were his bank books and that he earned that money working at the Cadillac, in the particular sums I asked him about."

It is earnestly contended for defendant that the production and marking of these bank books before the jury, and examining the witness in regard to a conversation with defendant about them, without offering them in evidence, was prejudicial error. The peculiarity of this episode seems to be that counsel on both sides seem to have regarded those bank books as inadmissible because not verified by the testimony of the bank officials. They were properly identified and proven so far as defendant was concerned by his own statements, and either side could have put them in evidence if so desired. Defendant identified them as his, said he earned the money they represented as having been deposited by him, did not question the dates or amounts when asked about them by the detective, and when on the witness stand testified himself that he did not steal the money he had in his bank account from his mother, but acquired it by gambling, in part as follows:

"I got this money working in a pool room on Michigan avenue; I was out gambling; that is how I made this money—gambling. That is what I told the officer. It was about January the 1st. I made $1,500 on January the 1st, 1923. I had been gambling. I ran up to $4,000 and I dropped it; then I thought I would quit and go into business. * * * I did not have any bank account in any bank between October, 1922, and January 1, 1923. I opened my account in the first part of January, 1923, when I first made the money, the $1,500. I did not deposit $2,000 at one time, I didn't have that much. The first amount was $1,500. I don't remember just what the book says, I believe I started out with about $100. I had a talk with Mr. Nyman, the detective who was just on the stand; at the station, the second day after I was arrested. * * * I told him I made this money gambling and playing cards, and that I picked up a job here and

there, whoever asked me to do it and I got paid for it.    I worked for the Cadillac Motor Car Company three weeks in January.    I told him I made all the money gambling and not at the Cadillac Motor Car Company.    A man could not make that much money in three weeks working at the Cadillac Motor Car Company."

No other assignments of error call for serious consideration.    The case was submitted to the jury under a plain, correct and impartial charge.

No reversible error is shown and the judgment will stand affirmed.

CLARK, C. J., and MCDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.