(No. 18082.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK LEROY LAWSON *et al.* Plaintiffs in Error.

*Opinion filed June 23, 1928—Rehearing denied October 15, 1928.*

GEORGE W. SPRENGER, and THOMAS O'MEARA, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, RUSSELL O. HANSON, State's Attorney, MERRILL F. WEHMHOFF, and CHESTER E. JACOBSON, for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiffs in error, Frank LeRoy Lawson and Sam Wade, (herein referred to as defendants,) were jointly indicted with George Dabney, Thomas Dabney and Orville Mann, in the circuit court of LaSalle county, for the robbery of Thomas Logeland, while armed with a gun. Lawson, Wade and George Dabney pleaded not guilty. Wade moved for a separate trial, but his motion was denied by the court. Mann and Thomas Dabney pleaded guilty and became witnesses in the trial of the other three defendants, Dabney for the People and Mann for the three defendants tried. George Dabney was found not guilty by the jury. Lawson and Wade were found guilty as charged in the indictment, and their ages were found to be thirty-two and twenty-six years, respectively. Motions for a new trial and in arrest of judgment were overruled and Lawson and Wade were sentenced to the penitentiary for an indetermi-

nate term of not less than ten years or for life. They have sued out this writ of error to review the record.

Baker, the village in which the robbery was committed, is in LaSalle county, about twenty miles north of Ottawa and located on the Chicago, Burlington and Quincy railroad, which runs east and west through the village. A public highway also runs east and west through the village and is parallel to the railroad and south of it. The railroad station and a grain elevator are between the railroad and the public highway. South of the highway, and a short distance west of the station, there is a two-story building facing the north, the first floor of which was used as a store room by Thomas Logeland on December 29, 1924, the date of the robbery, and the second floor was used as a hall. The store room was a large room, in which the counter extended north and south along the west side, and back of the counter and along the wall were shelves for merchandise and a cash drawer. In the south end of the room there was a heating stove, and east of the heating stove was a long bench. In the evening of December 29, 1924, about six o'clock or later, a number of people from the surrounding country had congregated at the store to attend an oyster supper that was to be served in the hall above. Others were still arriving and the oyster supper was about to be served. Logeland was attending to his trade and invoicing his stock of goods and was behind the counter. About the hour aforesaid four men riding in an enclosed car, described by some of the witnesses as maroon-colored and by others as red, drove through the village in a westerly direction, then turned and proceeded to a point a short distance east of the store, where the car stopped. Three of the men alighted from the car and the fourth man remained at the car. The three men then proceeded to the store and entered it, and one of them later came out and remained in front of the door while the robbery was being committed. All of the robbers were masked.

Thomas Dabney, of the age of twenty-two years and a resident of Marseilles, one of the defendants who pleaded guilty, testified to the planning and committing of the robbery in substance as follows: On December 28, 1924, he went to visit his father, George Dabney, at Mason City, Illinois, and about 5:30 in the afternoon he and his father went to Pekin. He met the defendant Lawson there about eight o'clock that evening at the restaurant of Lawson's brother. He talked to Lawson about committing the robbery at Baker and told him they could get about $500 there, and that "it would be easy picking." Lawson replied that they would go there and "make the deal." Witness stayed in Pekin that night and in the morning of December 29 returned to Lawson's restaurant and there saw Lawson and defendant Wade. They talked together and agreed to go to Baker that night and commit the robbery planned by them. They met again about one o'clock P. M. Wade was accompanied by defendant Mann in a red Gardner sedan automobile, and Lawson, Wade, Mann and witness and his father got into the automobile. Wade drove the car and Mann sat with Wade in the front seat. Lawson, witness and his father sat in the rear seat. They first drove to Peoria, and witness' father got out of the car and remained in Peoria and the other four drove to LaSalle, from there to Ottawa and thence north to Baker. They inquired at Serena, and also at a farm house, about the road to Baker and had some difficulty finding their way. They arrived in Baker about 7:30 P. M. They drove through the village and by Logeland's store in a westerly direction. They then turned and went back and stopped about a half block east of Logeland's store. All four of them were armed with revolvers. Lawson had a .32-20 Spanish gun, Wade and witness each had a .38 pistol, and Mann had a .38 special. Lawson remained at the car, and Mann, Wade and witness got out of the car and walked to the store. Mann had a blue stocking-cap pulled down over his face with two holes

cut in it for his eyes. Witness and Wade wore handkerchief masks. With drawn guns they entered the store, and Mann ordered the people there to hold up their hands and line up along the east wall. Several shots were fired by the robbers inside and outside of the building. Witness got on the outside of the store room and made the people in front of the building and those who came later hold up their hands while he searched them for guns, and after searching them he ordered them to go inside. Wade and Mann stayed on the inside. Wade struck one of the men in the store on the side of the head because he would not hold up his hands. They remained at the store about five minutes, and then, after robbing the people there, ran back to the car, beside which Lawson was then standing. They then drove toward Marseilles and from there to Morris. The roads were frozen and icy and their speed was about forty miles an hour. Between Marseilles and Morris the right front spring on the car was broken, which let the fender down on the wheel. They arrived at Morris about 9:30 P. M., and witness, Lawson and Mann left Wade and the car there. Lawson, Mann and witness, after getting something to eat, stole a Dodge car and started toward Stockdale. Mann was driving the Dodge car and it went into a ditch and turned over. They then walked to Stockdale and boarded an interurban car for Ottawa. Sheriff Welter got on the interurban car at East Ottawa and arrested all three of them. When witness saw the sheriff get on the interurban car he put the pistol he was carrying under the seat in which he was sitting. Mann, Lawson and witness were taken to the jail and searched by the sheriff and his deputies. The handkerchief masks, several one-dollar bills, pistols, cartridges and Logeland's watch were found on them by the officers. He further testified that after the robbery, and while they were driving between Serena and Morris, the four robbers divided the loot equally between them. When witness was searched he had $11.56, a blue handkerchief and eleven

.38-calibre cartridges on his person. He also saw Mann and Lawson searched. He saw the watch that was taken from Logeland in Mann's possession, and Mann said something about the watch when they were in Morris, after the robbery. Witness identified the guns and masks taken from himself and his accomplices by the officers and introduced in evidence, as the same guns and masks used during the robbery. Witness had known Wade for more than a year but had his first conversation with him on the day of the robbery. He had seen Mann before the day of the robbery but did not know his name and had not talked to him before the day of the robbery. He knew Lawson before the robbery. Mann wore a dark-blue coat, or sailor coat, at the time the robbery was committed.

George Dabney, father of Thomas Dabney, corroborated the testimony of his son as to his statement that Wade, Mann and Lawson met his son in Pekin at one o'clock in the afternoon of December 29, and that those four, together with witness, then went to Peoria in a red car, which was driven by Wade, and that witness left the car at Peoria and remained there. He further testified that none of them discussed the robbery in his presence and he did not know there was to be a robbery committed at Baker. Thomas Dabney was also corroborated by the testimony of a number of other witnesses who were in the store, or in front of it, at the time the robbery was committed, as to Dabney's statement as to the movement of the robbers' car in Baker before the robbery and as to the fact that there were four robbers, three of whom committed the robbery while the fourth remained at the automobile. He was further corroborated by these witnesses as to his testimony that two of the robbers at the store wore blue-dotted handkerchiefs as masks and that the third one had a stocking-cap drawn over his head and face with holes cut in it for his eyes, and some of those witnesses identified the masks that were introduced in evidence as the same

masks which were used by the robbers while committing
the robbery. One witness, Burton Kirkus, testified that he,
with five or six other men, was sitting on the bench in the
store when the robbers entered; that he was shot in the
leg by one of the robbers during the time the robbery was
committed, and that the robber with the stocking-cap mask
was the one who robbed the storekeeper, Logeland. Two
of the witnesses who were on the outside of the store
while the robbery was being committed testified to seeing
the three robbers run from the store after they had commit-
ted the robbery and get into the automobile and that they
were then driven away, and that there was a fourth man
standing at the car while they were running to it. Another
witness, Ivan Parisot, testified that he saw the fourth man
standing in front of the car and that one headlight was
burning, and that he saw three other masked and armed
men at the store and heard them fire a number of shots.
Another of those witnesses, Noah Logeland, testified that
he was compelled by the robbers to hold up his hands and
face the wall while they robbed him of his pocket-book,
in which he remembered that there was a one-dollar bill.
Nealie Tuntland gave testimony similar to Noah Logeland.

The storekeeper, Thomas Logeland, gave testimony to
the effect that on the evening of December 29, 1924, while
he was in his store invoicing his goods, he heard a shot
fired, and then a man came in and pointed a pistol at him,
ordering him to hold up his hands. The man had a blue
stocking-cap pulled down over his face, with holes cut in it
for his eyes. He had on a navy-blue sailor coat or jacket.
The man searched him and took from his pockets at least
ten one-dollar bills and an Elgin watch, which he valued at
$10. He identified the watch that was taken from Mann
by the officers when arrested, as the watch of which he
was robbed. The same man then took all the money that
was in his cash drawer. The total amount of money taken
from him was about $20 or $30.

Rollie Campbell testified for the People that on the evening aforesaid, as he was passing the store of Thomas Logeland, one of the robbers pointed a gun at him and told him to hold up his hands. When he hesitated the robber struck him on the jaw with his fist. He identified Wade as the robber who pointed the gun at him and struck him on the jaw. He stated that Wade took four dollars from him at that time. He was very positive that Wade was the robber who struck and robbed him. He stated that he had a good look at his eyes and face and that he was standing in the light at the time, and that he would know him anywhere by his eyes and his build, and by the further fact that he resembled a Chinaman. He also stated that he saw another robber in the store, armed with a long, blue gun and wearing a dark mask over his face, taking money out of the cash drawer; that there were three of the robbers in the store, and that as they went out of the front door they fired two shots.

The testimony of Clark Garland, Earl Fiddjment, Clarence Crossen and Elmer Sopher, all of Joliet, tends to prove that after Wade was left by the other three robbers at Morris, with the right front spring of his car broken, he managed to get his car from there to Joliet, about twenty miles northeast of Morris. Crossen's testimony is to the effect that on the day or night of the robbery he furnished a front spring for a Gardner car to the Dreyfus garage, at Joliet. He fixed the date by reference to his book, in which he charged the spring to the garage. He stated that the spring was not painted, and that it bore his stencil mark, "Crossen alloy No. 89," in whitelead, placed on it in his shop as his own trade-mark. Garland's testimony is, in substance, that on Monday night, December 29, 1924, he was night attendant at the Dreyfus garage, in Joliet. About ten o'clock that night Wade brought a maroon-colored Gardner sedan automobile, with black fenders, into the garage, with the right front spring broken. Wade

wanted the car repaired immediately, but witness told him he could not get it finished until the next morning. He talked with Wade for a short time about automobiles, and particularly about the Gardner make of car which Wade then had. Wade asked him, upon leaving the garage, where he could find a good hotel, and witness directed him to the Woodruff Inn, which is about four blocks from the garage. He was sure that the person who brought the car to the garage was Wade, the defendant, and stated that he remembered him because he had features resembling those of a Chinaman. Fiddjment, a mechanic at the Dreyfus garage, testified that he repaired the Gardner sedan mentioned by Garland, between nine and ten o'clock in the morning of December 30, 1924, by installing a new right front spring which was ordered from Crossen, a spring dealer in Joliet. The spring had Crossen's name and number on it in white letters. He did not remember the number. Sopher's testimony is, in substance, that in December, 1924, he was night clerk at the Woodruff Inn, in Joliet. In the early morning of December 30, 1924, Sam Wade registered at the hotel and was assigned to room 105. The register of the Woodruff Inn was introduced in evidence and showed the entry under date of December 29, 1924, "Sammy Wade, Pekin, Ill.," and opposite this entry was placed by the clerk the figures "105," with a circle drawn around them, which the clerk explained indicated that Wade had been assigned to room 105 and was without baggage. He saw Wade sign his name on the register and identified the defendant Wade in the court room as the same person that was at the hotel and who wrote the entry. He saw and talked to him at the time he registered, noted his peculiar facial features, and thought at first that Wade was a Japanese.

Adam Hofferbert, a police officer of Pekin, testified that he knew Wade and Lawson and knew that Wade had

a maroon-colored Gardner sedan car. He had orders to arrest these two men for questioning concerning the robbery at Baker. He saw Wade's car in a garage about two o'clock A. M., December 31, 1924, and on examining it saw a new spring on the right front end. The spring was not painted and bore the stencil mark in white paint, "Alloy No. 89." The other springs on the car were painted. He was accompanied by police officer John DeFretis, who corroborated Hofferbert's evidence in every particular, except DeFretis testified the spring bore the figures "89 or 79 and something like Crossen on it."

The following witnesses testified for the People in substance as follows: William Rohde, an operator of an interurban car between Joliet and Princeton and through Morris and Ottawa on the night of December 29, 1924, testified that on that night he left Morris about midnight, going west toward Ottawa. At Stockdale, four miles west of Morris, he was flagged by three men, who boarded his car. He proceeded toward Ottawa, and at East Ottawa sheriff Welter got on his car and arrested the three men. E. J. Welter, sheriff of LaSalle county, testified that he arrested Lawson, Mann and Dabney on the interurban car at East Ottawa on the night of the robbery and delivered them to the city officers of Ottawa, at the police station. He searched Lawson and took from him twelve one-dollar bills, a five-dollar bill, some cartridges, and a blue handkerchief with white dots. The police officers searched the other defendants. Lawson, Mann and Dabney each gave fictitious names, and each claimed that he was not acquainted with either of the other two. When arrested they were sitting in separate seats. Leo Woodward, a police officer of Ottawa, testified that he assisted the sheriff in arresting Lawson, Mann and Dabney and searched Lawson. He found a .32-20 Colt revolver in a belt on Lawson and some extra cartridges. He saw the blue handkerchiefs with white dots on them taken from the men and a number of

one-dollar bills and a watch. All of the men occupied different seats when arrested. Thomas Dabney identified the gun described by Woodward as a .32-20 Colt as the same gun that Lawson had at the time of the robbery.

To establish his defense Lawson relied on the testimony of himself and of Mann, who pleaded guilty. Mann's testimony is in substance the following: The robbery at Baker was committed by only three men—Thomas Dabney, a man named Tony, whose last name he did not know and who resembled Wade, and witness. They rode to Baker on the day of the robbery in a red Essex coach, driven by the man named Tony. The three men and George Dabney met on that day in Mason City and drove to Pekin, where they met Lawson, who told them he was going to Chicago to look for a job and asked them to take him to Marseilles, and they consented. Lawson did not notify his family that he was going to Chicago or take any baggage with him. The four men and Lawson then drove from Pekin to Peoria, and there George Dabney left them. The remaining four then drove to Marseilles and Lawson got out, and the remaining three, named by him as the robbers, proceeded to Baker in the Essex coach and committed the robbery. They then drove to Morris, and Dabney and witness got out of the Essex and into a Dodge car which was standing on the street and started toward Marseilles. Tony started from Morris toward Chicago in the Essex car. As witness and Dabney were driving out of Morris in the Dodge car they met Lawson and took him into the car, after telling him that he could get a job in Marseilles or Ottawa. They then drove west from Morris, and near Stockdale the Dodge car in which they were riding turned over into a ditch. The three then went to the interurban station at Stockdale and boarded an interurban car going to Ottawa, where they were arrested. Lawson told the same story on the witness stand as did Mann. He further stated that he knew nothing of the robbery and took no part in it; that he was in the

taxicab business in Pekin at the time of the robbery and was not out of a job, but he gave as a reason for going with Tony, Dabney and Mann to Marseilles that he was going to Chicago to find a job. He denied that any gun or cartridges or evidences of the robbery were taken from him at the time of, or after, his arrest. He stated that the money found in his possession at that time was money earned by him in his taxicab business.

Sam Wade's defense was an alibi. He did not testify. He produced in court ten alibi witnesses for himself, all of whom testified that they were acquainted with him and saw him in Pekin at various hours on December 29, 1924. Their evidence is in substance the following: Joseph Wade, his brother, saw him at 9:30 A. M. Walter Raab, his brother-in-law, saw him at supper about 5:30 P. M. Sam Watts saw him at two o'clock P. M. and rode with him in his car. Eddie Campbell testified that Wade worked for him in his restaurant in the afternoon. Carl Rueling, William Bates and Hugh Callahan saw Wade in Campbell's restaurant between 3:00 and 4:30 P. M. William Hanna and Earl Buchanan saw Wade in front of the theatre building in Pekin about seven o'clock P. M. John Meyer, in the garage business, sold to Wade on December 18, 1924, a front spring for his Gardner car and installed it on the right side of the front axle. He produced his books showing an entry on that date of a charge against Wade for a right front spring on a Gardner car and installing the same. He also stated that the spring sold to Wade had the word "Alloy" and the figures "89" on it. The word "Alloy" indicated the kind of steel of which the spring was made and the figures "89" indicated that it was a front spring for a Gardner car. Wade also relies on the testimony of Mann and Lawson.

It is contended by the defendants that the court committed a number of errors in its rulings on the evidence and on instructions given in the case which were very

prejudicial to them, and that the judgment and sentences should be reversed for that reason. Over the objection of counsel for Wade a record of the circuit court of Tazewell county showing an indictment of Eddie Campbell for the crime of burglary, his plea of guilty to that indictment and a judgment and sentence of the court on the plea of guilty and for his parole was introduced in evidence for the purpose of discrediting the testimony of Campbell. In that proceeding Wade was also a defendant, but all references to Wade in that record were excluded from the jury. Counsel for Wade objected to the introduction of that record on the ground that the Eddie Campbell therein mentioned was not shown to be the same person as the Eddie Campbell who testified in this case. Where it is sought to discredit a witness by proving his conviction of an infamous crime by the record of such conviction, if the name of the witness is the same as the name of the person convicted the record is admissible without first identifying the witness as the person convicted, since such fact will be presumed if not denied. (*Clifford* v. *Pioneer Fire-Proofing Co.* 232 Ill. 150.) There was no such denial in this case. The rule announced in the civil case cited is equally applicable to the same state of facts in a criminal prosecution.

The State's attorney was called as a witness and denied that he had promised immunity to Thomas Dabney in consideration of his testifying for the People. He was then asked if he had promised Dabney's attorney, or anyone else, immunity or probation for Dabney. The court sustained People's objection to this question. The court erred in this ruling. The benefit that Dabney sought to receive for testifying for the People, if any, was a fact to be taken into consideration by the jury in determining the credibility of his testimony. However, Dabney had already stated that he expected a parole for testifying; and the sheriff had testified that Dabney had stated to him that he would "squawk on anybody to save himself, even if the fellow

was not guilty." It is apparent that the jury were sufficiently advised of the character of Dabney and his reasons for testifying for the People, and the refusal of the court to allow the question to be answered by the State's attorney was not serious or prejudicial error and the conclusion of the jury was not affected by the ruling of the court.

The court did not abuse its discretion in denying the motion of Wade for a separate trial, and there was no error in allowing the defendant George Dabney, who was represented by separate counsel, to testify in his own behalf. The granting of a motion for a separate trial in a criminal case is addressed to the sound discretion of the court, and its action in denying the motion is not error unless it clearly appears that there was an abuse of such discretion. (*People* v. *Covitz,* 262 Ill. 514; *People* v. *Birger,* 329 id. 352.) There was no showing made to the court on this motion that the defense of Wade and his co-defendants was antagonistic. It was no fault of the State's attorney that George Dabney was tried with plaintiffs in error and testified in his own behalf. Dabney testified that he had nothing to do with the robbery, and that he rode with Mann, Lawson, Wade and his son as far as Peoria in a red car driven by Wade. Mann and Lawson testified to the same thing, except that they stated the car was a red Essex coach driven by the fictitious Tony.

It was not error for the court to allow evidence to go before the jury to the effect that the defendants in making their escape from the scene of the robbery stole a Dodge car. This fact was material in the trial of the cause. The rule has often been stated by this court that a defendant in a criminal case cannot suppress evidence of the crime for which he is being tried by multiplying his crimes. The purpose of this testimony was to show the recklessness and haste employed by the defendants in order to make their escape and get out of the vicinity of their crime, and such conduct tended to show guilt.

We have carefully examined the record showing the arguments of the State's attorney made before the jury and the contention of the defendants that they were unfair and prejudicial to them. The arguments of the State's attorney were based on the evidence, and the record does not show that he was guilty of any impropriety in making his arguments. A State's attorney has the right, and it is his duty, to review the evidence and discuss its weight. He may in his argument call the jury's atention to the fact, if it is a fact, that the testimony of witnesses for the prosecution has not been contradicted, even though the defendant has not testified in his own behalf. Such a statement is not a direct or unwarranted reference to the failure of the defendant to testify and is not otherwise improper. (*People* v. *Birger, supra,* and cases cited.) The court did sustain an objection to the State's attorney's statement to the jury in his closing argument that he "believed the evidence in this case showed Sam Wade guilty beyond a shadow of doubt." If the court had ruled otherwise we would not reverse the judgment for that reason. The rule applying to such arguments to a jury is, that the State's attorney is not permitted to say to a jury that he believes a defendant is guilty beyond a reasonable doubt, but it is within his discretion to state to the jury, after summing up the facts, that he believes from the evidence that the defendant is guilty beyond a reasonable doubt if there is any reasonable basis for such belief.

There are no grounds shown in this record for reversing the judgment because of error in the giving of instructions. Some of the instructions are somewhat faulty, but they disclose no sufficient reason for reversing the judgment. The rule is well established that all instructions given by the court should be considered as a series, and where all of the instructions, when considered together, cover all the rules of law applicable to the evidence, as they do in this case,

and present the law of the case fully to the jury, the purpose of instructing them has been accomplished. *People* v. *Kimler,* 324 Ill. 445; *People* v. *Bundy,* id. 190.

It needs little or no argument to show by this record that the defendants were proven guilty beyond all reasonable doubt. The testimony of Mann and Lawson is contradicted in every feature of it as to their testimony relating to the guilt of Lawson and Wade, by the officers who arrested them and searched them, by the witnesses at the scene of the robbery and by the Joliet witnesses. If from this record the testimony of the two Dabneys should be excluded entirely, the other evidence is ample and convincing that the defendants are guilty of the crime charged beyond a reasonable doubt, and the jury would not have been warranted in returning a different verdict.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*