Argued February 19; affirmed March 12; rehearing denied
May 14, 1935

STATE *v.* BLACK ET AL.

(42 P. (2d) 171, 44 P. (2d) 162)

*William P. Lord* and *Frank J. Lonergan,* both of Portland (B. A. Green and T. Walter Gillard, both of Portland, on the brief), for appellants.

*Earl F. Bernard* and *Maurice E. Tarshis,* both of Portland (James R. Bain, District Attorney, and Collier, Collier & Bernard, all of Portland, on the brief), for the state.

ROSSMAN, J. The first assignment of error is based upon rulings of the circuit court which denied motions for directed verdicts made by the defendants at the conclusion of the presentment of the evidence. The assignment of error based upon these rulings states: "There was not sufficient evidence to identify the defendants on trial as the persons who committed the alleged assault." This contention necessitates a review of the evidence, but we shall first take note of §13-904, Oregon Code 1930, which provides: "If the indictment be for a misdemeanor, the trial may be had in the absence of the defendant, if he appear by counsel; * * *"

The defendants did not testify nor produce any witnesses, and their counsel presented no argument to the jury. While the motion for a directed verdict was being argued, the district attorney declared: "I think the record should show that these defendants have not been in the courtroom during the course of this trial." Counsel for the defendants then replied: "I don't think the record can show they have not been in the courtroom, because that is not the fact." It seems clear from statements in the briefs of both parties that if the defendants were in the courtroom at any time during the course of the trial they were there for only a short period and that the prosecution was unaware of their presence.

The state presented the testimony of eight witnesses, two of them being Carl Jensen and John V. Lake, the victims of the alleged crime. These two men testified that they lived in The Dalles and arrived in Portland June 27, 1934, for the purpose of becoming special police officers during the longshoremen's strike which was then in effect. Upon making application at the police station they were given the desired employment. June 28 at 7 o'clock a. m. they departed from the Carlton hotel for the police station. Before they had taken many steps they encountered a crowd of men whose rapid advance toward them caused them to hastily retreat to the hotel. Having done so they telephoned to the police station and then seated themselves in the hotel lobby. Neither possessed weapons. They swore that shortly four men entered the hotel lobby and after approaching within a few feet of the two special officers, one of them retired. Before he had done so one of the four declared: "That's them; get them." Jensen testified that after this exclamation had been made one of the three men ordered him to go outside and that, upon his refusal to do so, this individual "grabbed hold of me and pulled me out of the chair and then I wrapped my arm around his legs and we went to the floor". In the meantime, according to Jensen and Lake, the other two men seized Lake, a scuffle ensued, and after Lake had been overpowered he was forced out of the hotel. Lake testified that his two assailants shoved him around the corner of the hotel and then one of them released his hold and ran back toward the hotel entrance. Simultaneously another individual came up and took the place of the assailant just mentioned. About this time, according to the testimony of Jensen, the assailant struggling with him was joined by another and the two then

forced him out of the hotel, where they were observed by two police officers who, in response to the aforementioned call, had come to that vicinity. In obedience to the police officers' command, Jensen was released. About the same time another group of officers on their way to the hotel discovered Lake and released him from his captors. Lake and Jensen testified that each had been given a severe beating before the police officers arrived.

The testimony of James K. Norman, clerk of the Carlton hotel, corroborated substantially all of the aforementioned testimony.

The two complaining witnesses and three of the police officers (Anundson, Christopherson and Madden) who participated in the incident, swore that after releasing the two complaining witnesses from their captors they arrested three of the latter and sent them to the police station.

Both Jensen and Lake testified that they had never before seen any of their four assailants. Both swore that when the three arrested men were sent to the police station they too went there and reached the station at about the same time as the prisoners. They added that they, the prisoners, Anundson and Christopherson, were taken to the detective bureau. Madden did not go to the station. Here the group of seven were joined by two members of the detective staff, Williams and Tackaberry. Christopherson and Anundson testified that their duties required them to make a report of the incident and that, accordingly, they inquired of the three prisoners for their names. Christopherson testified that one of the two whom he had arrested stated that his name was Samuelson, and that the other gave the name of Hanlon. He added that, since he had not arrested the third, he did not inquire for

his name but heard him give the name of Black. Anundson, the officer who had arrested the latter, testified that at the station he gave the name of Thomas Black, and added that he resided at No. 527 Northwest Eighteenth avenue. Williams, one of the detectives to whom the three men were delivered for questioning, testified that one of them declared himself to be Thomas F. Black; another gave the name of Malcolm R. Samuelson, and that the third identified himself as James Hanlon. Jensen and Lake testified that at the police station they heard the three prisoners give the above names, and that they recognized them as three of the men who had entered the hotel. Jensen swore that it was Hanlon and Samuelson who had engaged him in encounter. Lake testified that the two men who had seized him in the hotel lobby identified themselves at the police station as Thomas F. Black and James Hanlon; that it was Hanlon who released his hold after he (Lake) had been forced along the street, and who hurriedly returned to the hotel.

Williams further testified that he and Tackaberry separated the three men and then interviewed them in the detective bureau, stating that he questioned Black and Samuelson while Tackaberry talked to Hanlon. He swore that after Black and Samuelson had answered his questions he typed the substance of their replies and that each, after reading the statement thus prepared concerning himself, signed it. The one signed by Black reads as follows:

"Portland, Oregon, June 28th, 1934. I, Thomas Black, make the following statement regarding the affair at the Carlton Hotel this morning about 8-00 A. M. I am married and live at 527 N. W. 18th Ave. I have been on the sick committee since the strike and report at the labor Temple and work out of there, I

was on my way to work this morning when at 14th Ave. and Washington St. I, noticed some of our men there namely M. R. Samuelson and Jim Hanlon and others, they said there is some scabs in the lobby of the hotel and pointed out two men who was sitting in chairs, we went in and I and Samuelson took one of the men by arm (Lake) and went out side and was walking down the street when the officers came up, I did not know where the squad cars was at the time nor did I know who was in charge of our boys. Hanlon and some one else had Jensen in charge when the officers came up, but I do not know who the other man was, I did not hit any one while on this mission we only wanted to talk to them, we at the intersection of 15th and Washington St. when the officers arrested us."

The one signed by Samuelson follows:

"Portland, Oregon, June 28th, 1934. Statement of Malcolm R. Samuelson. I, M. R. Samuelson, make the following statement regarding the affair at and near the Carlton Hotel corner of 14th Ave. and Washington St. this morning about 7-45 A. m. I am married and live at 2818 N. Hunt St. and work as a longshoreman, and during the strike have been working out of the 9th Ave and Everett Hall, when I am not picking berries. I was at the above hall this A. M. when Bob Smith the despatcher at the 9th Ave and Everett Hall sent two or three cars to 14th Ave and Washington St. in charge of Tom McCarthy, McCarthy was man who took the orders and I rode up in one of the cars. When we arrived at the Carlton Hotel we got out of cars stood around a few minutes and with Thomas Black and Jim Hanlon went into the hotel, Tom Black was the First man who approached these men and asked them to come out side as we wanted to talk to them, they did not want to come out side, we took them by the arms and led them out and when in about half block from the hotel the officers came up and brought us all to the station. I and Hanlon had the man who afterwards learned was Carl Jensen when the officers

came up. I never struck any of these men at no time nor did I see any body struck by our gang."

Williams testified that Jensen and Lake, in the presence of the three prisoners, pointed out Black and Hanlon as the individuals who had struck them, and that both declared that Samuelson had helped to take them out of the hotel. He also testified that Black and Hanlon denied that they had struck Jensen and Lake. He added, "I couldn't say whether they heard it or not * * * you can hear any one talking all over the room". Tackaberry did not testify, the explanation being made that he was "out on some business". Counsel for the parties, however, stipulated as to the substance of his testimony. In the words of defendants' counsel it was agreed that he would testify that "a man named James Hanlon, at the police station, in the detective office, refused to give a statement".

The two complaining witnesses described in detail the physical features and clothing of the men who, they said, had made the attack. None of the evidence above reviewed is contradicted, and the credibility of none of the witnesses is impeached. The foregoing, we believe, constitutes a fair review, brief though it be, of the testimony concerning identity.

The court received in evidence copies of the arraignment orders dated July 12, 1934. (There were two indictments.) They are substantially alike, and we quote from one the following:

"State of Oregon, Plaintiff,
 vs.
Thomas F. Black, Malcolm R. Samuelson and James Hanlon,
 Defendants. } C-19236

Now at this time comes the State of Oregon, by Joe P. Price, Deputy District Attorney, and the de-

fendants appearing in person and with their attorneys, Wm. P. Lord and T. Walter Gillard, an indictment having been heretofore, to-wit: on the 3rd day of July, 1934, duly presented and returned into this Court by the Grand Jury of the County of Multnomah, State of Oregon, and filed with the Clerk, charging said defendants with the crime of ASSAULT AND BATTERY. Said defendants now duly arraigned by the District Attorney under the Court's direction, reading said indictment to the defendants, and delivering to said defendants a certified copy of said indictment, and the endorsements thereon, including the list of witnesses endorsed on said indictment. Said defendants each states that he is truly named in the within indictment.''

From the defendants' brief, filed in this court, we quote:

''On the 3rd day of July, 1934, the defendants were jointly indicted by the grand jury of Multnomah County for the crime of assault and battery alleged to have been committed on June 28, 1934, on the persons of Carl Jensen and John V. Lake * * * The defendants were indicted on two separate indictments. On the 12th day of July, 1934, the defendants appeared in person and with their attorneys, and each pleaded not guilty and each stated that he was truly named in the indictment. * * * The defendants did not appear in person at the counsel table during the trial, but were personally in the courtroom during a portion of the trial, except defendant Black * * *''

█ Since the jury returned a verdict of guilt, they evidently found that the men on trial were the men who had committed the assault described by the complaining witnesses. The question now occurs, does the above evidence substantiate the finding of identity. It will be observed that the two complaining witnesses and the three police officers who made the arrests testified that the men taken to the police station were the men who

were leading the complaining witnesses down the street. The two officers who went to the police station testified that the men whom they sent there gave the names which appear in the indictment. Williams, the detective, gave like testimony. He also produced the above statements wherein Black and Samuelson confessed participation in the altercations. Hanlon, according to this witness, when confronted by the complaining witnesses, denied that he had struck blows. The above, we believe, is competent, substantial evidence in support of the finding that the men who were lodged in the city jail were three of the men who had committed the alleged assault. But the defendants argue that it has not been established that the men arraigned were the same individuals who were arrested. The above excerpts taken from the defendants' brief, we believe, are a clear admission that the men who were arraigned were the same individuals who were indicted and convicted. Section 9-807, subd. 25, Oregon Code 1930, enumerates as a disputable presumption "identity of person from identity of name". In *State v. Locke,* 77 Or. 492 (151 P. 717), the defendant who had been convicted of polygamy, upon appeal, contended that an Indiana marriage license which had been received in evidence had not been identified as having been issued to himself. This court, however, held that the identity of names created a presumption of identity of individual. See also *Summers v. Geer,* 50 Or. 249 (85 P. 513, 93 P. 133). From *The People v. Lawson,* 331 Ill. 380 (163 N. E. 149), we quote:

"Where it is sought to discredit a witness by proving his conviction of an infamous crime by the record of such conviction, if the name of the witness is the same as the name of the person convicted the record is admissible without first identifying the witness as the

person convicted, since such fact will be presumed if not denied.''

See to like effect *People v. Schanda,* 352 Ill. 36 (185 N. E. 183). From *State v. Taylor,* (Mo.) 274 S. W. 47, we quote:

''Appellant charges the trial court with error in permitting the state to introduce in evidence a certified copy of a judgment of the criminal court in St. Louis, Mo., showing that Harry Taylor had been found guilty of a felony in said court and sentenced to the penitentiary in March, 1921. This record was offered in evidence to attack the credibility of defendant's testimony. He denied that he had ever been convicted in St. Louis of any crime. His wife testified to substantially the same facts. No other testimony was offered on this subject. The evidence was admitted on the theory that there was an identity of names and it was a question for the jury as to whether the defendant and his wife testified truthfully in reference to the matter. The rule of the court in regard to the above question is fully sustained by the court en banc and this division in Brooks v. Roberts, 281 Mo. 551, Loc. Cit. 559, 220 S. W. 11, and State v. Wilson, (Mo. S.) 242 S. W. 886, Loc. Cit. 888 * * * without discussing this subject further, we are of the opinion that the trial court committed no error in following the rule of law announced in above cases.''

From *Sullivan v. Commonwealth,* 222 Ky. 771 (2 S. W. (2d) 666), we quote:

''Appellant insists that the trial court erred in not directing his acquittal because the record contains no evidence that he is the same Charlie Sullivan who was the defendant in the previous prosecution, record of which was read to the jury to establish the fact of the previous conviction. Charlie Sullivan was being tried under an indictment which charged him with having committed the offense of manufacturing whisky unlawfully, after having previously been convicted of that offense. The evidence was ample to establish that he manufactured the whisky on the occasion named in the

indictment, and there was none to the contrary. The record evidence of the previous indictment, trial and conviction of Charlie Sullivan for the same offense was read to the jury. It is true that no witness deposed that the Charlie Sullivan then on trial was the same Charlie Sullivan previously tried and convicted. However, the principle, 'Identity of name is prima facie evidence of identity of person,' has long prevailed in this jurisdiction.''

After citing authorities, the court held that no error had been committed. In *State v. Herren,* 173 N. C. 801 (92 S. E. 596), the facts were: The defendant had been convicted of bigamy; he appealed and assigned as error the exclusion of a record of divorce showing that the marriage ties between himself and one of his alleged wives had been severed. We quote from the decision:

''The defendant in this indictment is John R. Herren, and it is charged in the indictment that his first wife was named Lizzie V. Herren, and the plaintiff in the proceeding for divorce in Georgia was John R. Herren and the defendant therein was Lizzie V. Herren. This identity of names, nothing else appearing, furnishes evidence of the identity of person. 'Identity of name is prima facie evidence of identity of person, and is sufficient proof of the fact, in the absence of all evidence to the contrary.' 10 R. C. L. 877; Wilson v. Holt, 83 Ala. 528; Estate of Williams, 128 Cal. 553; Summer v. Mitchell, 29 Fla 179; Brown v. Metz, 33 Ill. 339; Jackson v. King, 5. Cow. (N. Y.) 237; Chamblee v. Tarbox, 27 Tex. 139.''

From *State v. Kilmer,* 31 N. D. 442 (153 N. W. 1089, Ann. Cas. 1917E, 116), we quote:

''Nor is there any merit in the contention that there was no proof that the H. E. Kilmer therein described was the H. E. Kilmer who was prosecuted. The presumption is that he was the same party. 'It is an inference of fact that identity of name indicates an iden-

tity of person, and it has been held that the court itself will assume the inference to be correct, in the absence of evidence to the contrary.' See 16 Cyc. 1055; People v. Rolfe, 61 Cal. 540; State v. Robinson, 39 Me. 150; State v. McGuire, 87 Mo. 642. And this presumption is augmented where both the surnames and the given names are identical, where an appropriate initial is written out in full, or where there is other identification. See 16 Cyc. 1055, note 41. It is true that this presumption may, according to some authorities, be overcome by a conflicting presumption of law, and that the presumption of innocence is one of these presumptions. The cases which are cited by counsel, however, do not appear to be in accord with the weight of authority nor with sound reason. See State v. McGuire, 87 Mo. 642; State v. Kelsoe, 76 Mo. 505; Gitt v. Watson, 18 Mo. 274; Flournoy v. Warden, 17 Mo. 435; Hendricks v. State, 26 Ind. 493; People v. Rolfe, 61 Cal. 540; Com. v. Norcross, 9 Mass. 492; Bogue v. Bigelow, 29 Vt. 179. There, too, are other statements in the record, such as residence, which tend to prove the identity.

"The conclusion of the supreme court of Missouri, that where the names are identical it rests with the defendant to prove that they are not the same, certainly meets with our approval, and is in accordance with sound public policy. In addition to that, we have paragraph 25 of § 7936, Compiled Laws of 1913, which enumerates identity of person from identity of name among the denominational or disputable presumption."

See also *State v. Aime,* 62 Utah 476 (220 P. 704, 32 A. L. R. 375), and *State v. McClurg,* 50 Idaho 762 (300 P. 898). For a collection of many additional authorities, see Wigmore on Evidence (2d Ed.), § 2528, footnote 3.

The above, we believe, constitutes a sufficient citation and review of the authorities. They indicate that identity of name ordinarily suffices to prove prima facie identity of individual. If the presumption of innocence encounters proof of identity of name the

courts, nevertheless, engage in a presumption of identity. In addition to *State v. Kilmer,* supra, see Wigmore on Evidence (2d Ed.), § 2493. Based upon these principles, we are justified in assuming that, since the men who were arrested bore precisely the same names as the individuals who were indicted and arraigned, they were the same men.

The next assignment of error is based upon rulings made by the trial judge during the argument to the jury by Mr. John Mowry, deputy district attorney. The following taken from the bill of exceptions reveals the basis for this contention:

"Now, there is one thing I don't want you to be fooled about, and that is by these defendants not putting in an appearance around this court. So far as the court is concerned and so far as you ladies and gentlemen are concerned, these defendants are not here. I don't know whether they are here or have ever been here. As far as I know, they haven't been here. Now, ladies and gentlemen, they have got a right to be here, they have a right to be here, and how many people did you ever hear of that went on trial that wasn't present at their own trial?

"Mr. Lonergan: I desire, your Honor, to interpose an objection * * *

"Mr. Mowry: They have got the privilege of being here. I am not commenting on what counsel has in mind at all. I am simply commenting on the fact that they are not here which I have a right to do. There is nothing constitutional about the right to stay away from this trial, your Honor. They have the privilege of being here. I have a right to draw any inference I see fit from the fact that they are not here. This jury has a right to draw any inference they see fit from the fact that their presence is not here.

"Mr. Lonergan: That is absolutely untrue and contrary to law. Your Honor will have to instruct the jury that the fact that the defendants are not here in

court and haven't taken the witness stand have nothing to do with the case.

"Mr. Mowry: As far as the latter statement of counsel, that is absolutely true. As far as the former—

"The Court: (interrupting) I will see counsel in chambers a moment before ruling."

A discussion then occurred in chambers, at the conclusion of which the trial judge ruled:

"Gentlemen, I will deny the motion for mistrial, and allow an exception; and I will give an instruction —I will quote the statute with reference to the failure to be in court. They do not have to be here."

Proceedings were then resumed in the courtroom as follows:

"Mr. Mowry: Now, ladies and gentlemen, as I say, these defendants as far as the Court knows, and as far as you know, have not been in this courtroom, they are not in this courtroom—

"Mr. Lonergan: (interrupting) I want to now again save an exception to the repetition of counsel for the state * * *

"The Court: The Court will sustain the—No, you are renewing your motion for mistrial?

"Mr. Lonergan: Yes, I am, your Honor.

"The Court: I will deny the motion and allow an exception.

"Mr. Mowry: I will go farther than that, I will say that as far as those defendants are concerned, how do you know they are not all fugitives right now?

"Mr. Lonergan: I now, your Honor, object to the statement from the district attorney as improper conduct, clearly improper conduct, as making personal remarks toward defendants in a criminal case, as insinuating that they are fugitives, to this jury, and as again saying to the jury in his language, remarks that are both insulting, unfair and improper. I assign it now as prejudicial error, coming from the deputy district attorney and ask now for a mistrial in this case.

"The Court: The Court will sustain the objection as to the comment but denies the motion for mistrial. And the district attorney will govern himself accordingly.

"Mr. Mowry: Yes, ladies and gentlemen, I apologize for any remarks I made about these defendants. Sure, it is a fine thing. These two boys that got beaten up on that street they can sit on that witness stand all afternoon yesterday and all morning this morning and be browbeaten and be pummeled verbally around this court: 'Can you describe this; can you describe that?' and one of them was so groggy he couldn't hardly walk for 400 feet. Yes, it is all right for them. But these defendants that don't even show up, when, if they showed up—why don't they confront these men?

"Mr. Lonergan: Your Honor, I again renew my motion for mistrial and object to the statements * * *

"The Court: The Court sustains the objection, but denies the motion for mistrial. And at this time, in order to clear this particular point at issue I wish to read the section of the statute which refers to the presence of the defendant or defendants in a criminal case, stating further that this trial here, the crime charged is a misdemeanor against each and all of these defendants; and our Oregon statute provides this: 'If the indictment be for a misdemeanor, the trial may be had in the absence of the defendant, if he appear by counsel but if it be for a felony, he must be present in person.'

"Mr. Mowry: Yes, he may appear by counsel. I am not discounting that. He has the privilege of being here. I am not trying to say anything to prejudice you, ladies and gentlemen, against these defendants at all. The only thing I say is that the cross examination of these boys was absolutely unfair and absolutely uncalled for—absolutely uncalled for, and could easily have been avoided * * * Why, the identification of these boys! Why, I am surprised that they remember as much about them as they did, from what they were being put thru there. * * * Now, you ladies and gentlemen here took an oath that you were going to try this case on the law and the evidence. You all took

that oath, irrespective of your views about strikes or about labor trouble. I am not an employer and I am not a longshoreman, I don't know who is right or wrong in that situation, and I don't care, so far as I am personally concerned. I have got no concern with it because it is none of my business. But I do say this, as a matter of law, as a matter of law and as a matter of order, if you ladies and gentlemen as jurors, after taking an oath to try the case under the law and the evidence are going to put your stamp of approval on performances such as this in public hotels and public thoroughfares, we may, all of us, resign ourselves to confusion and finally to bloodshed. Now, that is all there is to it.''

As a prefix to defendants' argument in support of this assignment of error, their brief states that during the longshoremen's strike, one Connor, a longshoreman, was murdered. In support of this assignment of error, defendants argue (1) that the above comment invited the jury to infer that the defendants were the individuals who had murdered Connor, and that since taking his life they had become fugitives; (2) that the comment denied to the defendants the privilege afforded by section 13-904, Oregon Code 1930, previously quoted; (3) that the argument directed attention to the fact that the defendants had omitted to call character witnesses; and (4) that it constituted comment on the defendants' omission to testify.

██ So far as is disclosed by the record, the name Connor was never mentioned during the course of the trial nor in the argument. We know nothing concerning him nor of his purported death. We do not believe that the district attorney's argument in any way invited attention to Connor. Nor do we believe that his comment called attention to the defendants' omission to produce witnesses. Since he emphasized the failure

of the defendants to attend their trial, it is reasonable to assume that the jurors may have thought incidentally of the defendants' omission to testify. Oregon Constitution, Article I, section 12, provides that a defendant shall not be compelled in any criminal prosecution to testify against himself. Remote allusions in argument to the failure of the defendant to testify, which are made incidentally during the discussion of other propositions, are not deemed violative of the right thus protected by the constitution: 2 R. C. L., p. 431, § 30; 16 C. J., Criminal Law, p. 903, and annotation Vol. 68 A. L. R. 1121. We believe that the district attorney was not engaged in a discussion of the defendants' omission to testify, and that if the above-quoted comment may be deemed an allusion to such omission the reference was casual and not violative of the defendants' rights.

■ We believe that, apart from two portions of the above-quoted argument which we shall later specifically mention, the argument was comment upon the difficulty in identifying the defendants which the state had experienced through the defendants' omission to attend the trial. It is true, as appears from the above-quoted statute, that the trial could proceed during the absence of the defendants. But the exercise by an accused of a right which he possesses may, under proper circumstances, be the subject matter of comment by the district attorney. For instance, the defendant has a right not to call any witnesses, yet his exercise of this right may, in the discretion of the trial judge, be the subject of comment: *State v. Mims,* 36 Or. 315 (61 P. 888), and 16 C. J., Criminal Law, p. 904, § 2250. Likewise, while the defendant has a right to testify upon only a portion of the issues, if he takes the stand,

his failure, when upon the stand, to explain other incriminating facts attributed to him by the witnesses is generally deemed fair subject for comment: 16 C. J., Criminal Law, p. 902, § 2248. Possibly it is not technically accurate to say that in these instances the right possessed by the defendant becomes the subject of comment; rather it is his failure, in the face of incriminating circumstances, to explain which becomes the occasion for comment. Therefore, the mere circumstance that the defendants could rightfully stay away from their trial does not necessarily demand a holding that the district attorney could not mention their absence. We know of no reason why the district attorney could not rightfully comment on the defendants' absence if his comment on that subject was germane to any issue awaiting the jury's determination. Apparently identity was one of the main issues, if not the only issue, in the circuit court. Had the defendants been present this issue could have been speedily settled. The state's witnesses, instead of describing at length clothing and physical features, could have made their identifications by looking at the defendants. That, apparently, was the proposition upon which the district attorney was commenting. Likewise, was not the absence of the defendants an admission that they bore the features imputed to them by the witnesses?

It is clear that if the defendants had been in the courtroom no right possessed by them would have been violated if their presence had been resorted to as a means of identification by the state's witnesses. For instance, in *State v. Clark,* 156 Wash. 543 (287 P. 18), the defendant was ordered, over his objection, to stand up and walk in front of the chair occupied by the prosecuting witness for purposes of identification. The

courts held that he was not thereby compelled to give evidence against himself. In *State v. Oschoa,* 49 Nev. 194 (242 P. 582), the defendant was required to remove his coat and shirt and permit the jury to see scars on his body. Next, he was compelled to don a shirt introduced in evidence. It was held that this procedure violated no right possessed by the defendant. *In State v. Ah Chuey,* 14 Nev. 79 (33 Am. Rep. 530), the defendant was compelled to exhibit his arm so as to reveal tattoo marks thereon which a previous witness had sworn were there. The court found no error. In *Benson v. State* (Tex.) 69 S. W. 165, while a witness was testifying the defendant was required to stand up and put on his hat so that the witness might see him in that condition and then speak as to his identification. The court had no doubt as to the regularity of this proceeding. In *State v. Casey,* 108 Or. 386 (213 P. 771, 217 P. 632), X-ray photographs of the defendant's arm, taken while he was under arrest, were held admissible in evidence. For a citation to numerous other authorities, see Wigmore on Evidence (2d Ed.) § 2265, footnote 2. Many of the authorities, in support of their holding, cite *Holt v. United States,* 218 U. S. 245 (31 S. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138). In that case a question arose as to whether a blouse belonged to the prisoner. He was required to put it on. We now quote from the decision:

"It is objected that he did this under the same duress that made his statements inadmissible, and that it should be excluded for the same reasons. But the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof."

· No error was found. From Wigmore on Evidence (2d Ed.), § 2265, we quote:

"The limit of the privilege is a plain one. From the general principle (ante, § 2263) it results that an inspection of the bodily features by the tribunal or by witnesses cannot violate the privilege, because it does not call upon the accused as a witness, i. e. upon his testimonial responsibility. That he may in such cases be required sometimes to exercise muscular action— as when he is required to take off his shoes or roll up his sleeve—is immaterial,—unless all bodily action were synonymous with testimonial utterance; for, as already observed (ante, § 2263), not compulsion alone is the component idea of the privilege, but testimonial compulsion. What is obtained from the accused by such action is not testimony about his body, but his body itself. Unless some attempt is made to secure a communication, written or oral, upon which reliance is to be placed as involving his consciousness of the facts and the operations of his mind in expressing it, the demand made upon him is not a testimonial one. Moreover, the main object of the privilege (ante, § 2251) is to force prosecuting officers to go out and search and obtain all the extrinsic available evidence of an offence, without relying upon the accused's admissions. Now in the case of the person's body, its marks and traits, itself is the main evidence; there is ordinarily no other or better evidence available for the prosecutor. Hence, the main reason for the privilege loses its force."

The comment by the district attorney, therefore, upon the difficulty of identifying the defendants through their failure to attend the trial violated no right possessed by them. ·

 But the district attorney's argument also (1) indicated the consequences which might follow a failure to enforce the criminal law; and (2) inquired "How do you know that they are not all fugitives right now?" Arguments which are fairly intended to quicken the

jury's sense of duty are not deemed improper. See annotation, 78 A. L. R. 1465. We find no error revealed by the first of the above two subdivisions of defendants' contentions.

The second subdivision, however, points out comment which was not material to any issue awaiting the jury's determination, and which was calculated to do the defendant no good. The remark should not have been made. But before a judgment will be reversed because of improper argument, it must appear that the defendant was prejudiced thereby. Any inference of prejudice will be overcome when the defendant's guilt is clearly established: *Robbins v. United States,* 229 Fed. 987 (144 C. C. A. 269) ; *People v. Buckminster,* 282 Ill. 177 (118 N. E. 497) ; *State v. Cosler,* 39 Idaho 519 (228 P. 277) ; and also the collection of cases in 84 A. L. R. 791. The evidence previously reviewed, we believe, clearly indicates that the defendants are guilty of the crime charged in the indictment. If the evidence were of a doubtful character this improper argument would well warrant a reversal. But because of the cogency of the proof and its character we are forced to believe that the facts and not the improper remark influenced the jury. Therefore, this improper argument does not warrant a reversal.

The final assignment of error submits ''that the sentence of one year in the county jail was disproportionate to the offense and violated constitutional guaranties''. The uncontradicted evidence indicates that the two complaining· witnesses were severely beaten. Article I, section 15, Oregon Constitution, provides:

''Laws for the punishment of crime shall be founded on the principles of reformation, and not of vindictive justice.''

Section 14-232, Oregon Code 1930, provides that the punishment for the crime of assault and battery "shall be punishment by imprisonment in the county jail not less than three months nor more than one year, or by a fine of not less than $50 nor more than $500". The record discloses nothing concerning these defendants. The present theory of penalization is not merely that the penalty shall fit the crime but also that it shall fit the individual. Before it can fit the latter the court must know something concerning him. We do not. But since the record discloses that the defendants, pursuant to the request of the circuit court, appeared personally at the time of sentence, we assume that it was found that a penalty of one year was demanded by the circumstances. The facts which warranted a reduction of the penalty in *State v. Ross,* 55 Or. 450 (104 P. 596, 106 P. 1022, 42 L. R. A. (N. S.) 601, are not present in the present instance. This assignment of error discloses no merit.

It follows from the above that the judgment of the circuit court must be affirmed.

CAMPBELL, C. J., and BELT and KELLY, JJ., concur.

---

Petition for rehearing denied May 14, 1935

ON PETITION FOR REHEARING
(44 P. (2d) 162)

ROSSMAN, J. The petition for a rehearing is predicated largely upon a contention that we should have reversed the judgment of conviction because the district attorney, in his argument, declared to the jury: "How do you know they are not all fugitives right now?" As stated in our previous opinion, the trial judge promptly sustained the defendants' objection to

this comment. Our opinion pointed out that this remark "should not have been made". We declined, however, to reverse the conviction because the proof of the defendants' guilt came from several witnesses whose credibility was not assailed and whose testimony was not contradicted in any detail. We felt justified in believing that the conviction was prompted by the overwhelming proof of guilt and that, therefore, the unwarranted remark did not constitute reversible error. The petition for a rehearing insists that "this is the first time in the history of the State that the court" has employed such a principle, and that our employment of this principle "is such a departure from previously conceived notions of criminal practice in this State" that the matter should be given further attention.

As early as *State v. Glass*, 5 Or. 73, this court employed the principle that a judgment of conviction will not be reversed for error which worked no injury upon the defendant. Since that time we have many times held that erorr, in order to warrant a reversal, must be prejudicial.

The principle just announced has been applied in previous instances similar to the one now before us. In *State v. Blodgett*, 50 Or. 329 (92 P. 820), which has received much commendation in the brief accompanying the petition for rehearing, this court stated:

"But a case should not be reversed where improper references have been made by counsel in their argument to immaterial and irrelevant matters, unless it further appears that the injury to the rights of defendant resulted, and that will be determined by the issue involved and the state of the evidence."

From *State v. Pender*, 72 Or. 94 (142 P. 615), we quote:

"We think that the remarks made by counsel and objected to were improper, but that they were not prej-

udicial to the defendant and that we have no right to reverse the judgment on account thereof."

In announcing our decision in *State v. Pointer,* 106 Or. 589 (213 P. 621), the carefully prepared decision stated:

"A case will not be reversed upon account of improper argument of counsel, unless it appears from the record that injury to the rights of defendant resulted: State v. Blodgett, supra. The entire argument of the special prosecutor, as well as the excerpts in question, was fresh in the mind of the trial court when passing upon the motion for a new trial. Thus qualified to decide the matter, the court determined that the rights of defendant were not prejudiced by the conduct of counsel. We cannot say that the decision overruling the motion for a new trial was an abuse of discretion."

The appellants direct our attention to the recent decision entitled *Berger v. United States,* 295 U. S. 78, (79 L. Ed. 667, 55 S. Ct. 629), and declared:

"The opinion in this case is in direct conflict with the opinion of the United States Supreme Court in the Berger case."

We quote from the case just mentioned the following:

"That the United States prosecuting attorney overstepped the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense is clearly shown by the record. He was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and in general, of conducting himself in a thoroughly indecorous and improper manner. * * * The prosecuting attorney's argument to the jury was undigni-

fied and intemperate, containing improper insinuations and assertions calculated to mislead the jury.''

In disposing of the assignments of error predicated upon this situation, the court observed:

''The court below said that the case against Berger was not strong; and from a careful examination of the record we agree. Indeed, the case against Berger, who was convicted only of conspiracy and not of any substantive offense as were the other defendants, we think may properly be characterized as weak.''

The court held that under that circumstance it would not be justified in assuming that the prosecuting attorney's improper conduct had not prejudiced the defendant. We quote:

''In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its non-existence. If the case against Berger had been strong, or, as some courts have said, the evidence of his guilt 'overwhelming,' a different conclusion might be reached. Compare Fitter v. United States (C. C. A.) 258 F. 567, 573; Johnson v. United States (C. C. A.) 215 F. 679, 685, L. R. A. 1915A, 862; People v. Malkin, 250 N. Y. 185, 201, 202, 164 N. E. 900; State v. Roscum, 119 Iowa 330, 333, 93 N. W. 295.''

We fail to discover any difference between the holding of that case and our previous decision. Moreover, we believe that our previous decision is not only in accord with earlier decisions announced by this court but is also in harmony with the decisions of other courts and sound policy.

There are other matters argued in the petition for a rehearing, but we believe that our views in regard to them have been sufficiently expressed in our previous decision.

We are satisfied that there exists no occasion for a rehearing. The petition is, therefore, denied.