Argued September 21; affirmed December 14, 1943

# STATE *v.* CUNNINGHAM

(144 P. (2d) 303)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY, BRAND and HAY, Associate Justices.

*Elton Watkins,* of Portland, for appellant.

*James R. Bain,* District Attorney, *Thos. B. Handley,* and *Clarence A. Potts,* Deputy District Attorneys, all of Portland, for respondent.

ROSSMAN, J. This is an appeal by the defendant from a judgment of the circuit court which adjudged him guilty of the crime of murder in the first degree and ordered his execution. The entry of the judgment was preceded by a plea of not guilty and by a verdict of guilty returned without recommendation of the kind

permitted by Constitution of Oregon, Art. I, § 37, and § 23-411, O. C. L. A. Richard F. Kerr was the victim of the alleged crime.

The appellant submits eight assignments of error. The first is based upon (a) the reception of evidence which indicated that, in addition to the fatal bullet, three others entered the deceased's body; (b) the reception as evidence of the deceased's shirt, coat and a photograph of the latter; and (c) a ruling which permitted Dr. Joseph Beeman, a witness for the state, to answer the question: "That coat doesn't show the path that was taken by what you term the fatal bullet, does it?"

The second assignment of error is based upon a ruling which denied a motion made by the defendant for a mistrial. The motion was based upon a contention that the following volunteer answer made by Harold Sammons, a witness for the state, was prejudicial: "Well, there was another case that we had been talking to him (defendant) about."

The third assignment of error is based upon an order which overruled another motion made by the defendant for a mistrial. It was based upon the fact that concurrently with the opening of the trial newspaper items, which came to the attention of four of the jurors, mentioned the fact that the defendant was an ex-convict.

The fourth assignment of error is based upon a ruling which sustained an objection to a question submitted by defendant's counsel to the aforementioned Harold Sammons, inquiring whether he "beat up Pat Gray to make him confess."

The fifth assignment of error is based upon a ruling which overruled the defendant's objection to the following question propounded to Stanley MacDonald, a wit-

ness for the state: "Now, would the path that a bullet had taken through the body and the condition of the bullet found afterwards have something to do with your ability to identify it?" The objection was: "That is leading."

The sixth assignment of error is based upon a ruling which permitted the state to introduce as evidence three certified copies of judgment orders entered in felony cases by the circuit court of the State of Missouri. The first was entitled *State of Missouri v. Harvey Cunningham;* the second and third were entitled *State of Missouri v. Howard Cunningham.* Each was a judgment of guilt. The state contends that the defendant in those three cases and in this case is the same person. The defendant's name as entered upon the indictment in this case is Harvey Cunningham.

The seventh assignment of error is based upon a ruling which overruled the defendant's objection to a question propounded by the district attorney to Dr. W. C. Burkes, a witness for the defendant, inquiring as to the defendant's mental condition November 23, 1942. Dr. Burkes is a psychiatrist and examined the defendant on the day just mentioned.

The eighth assignment of error is based upon rulings which received in evidence, upon proffer of the state, certified copies of judgment orders entered in three felony cases adjudging Patrick Gray, a witness for the defendant, guilty.

According to the state, Richard F. Kerr, aforementioned, was shot to death in Portland on Saturday, August 29, 1942, at about 1:20 a. m.

At the commencement of the trial the defendant's counsel made no opening statement, but it developed after the state had rested that the prisoner depended

upon an alibi. He contends that when the shooting occurred he was in Fraternal Hall, a block or so distant from the intersection of Weidler Street and Victoria Avenue. The state contends that the homicide occurred on Weidler Street, a few feet distant from Victoria Avenue. The defendant swore that he entered Fraternal Hall about 11:30 p. m., August 28, and remained there until 2:30 a. m., August 29. During all of that time he was engaged, so he said, "in shooting craps." He is a Negro, 37 years old.

Evidence presented by the state indicates that immediately before the shooting, Kerr (a white man) and the defendant were exchanging some remarks near the street intersection we have already mentioned. Shortly, according to the state, the prisoner shot Kerr in the chest with a 38-caliber pistol (five chambers). At that moment, so the state says, Kerr turned around and started to flee, pursued by the defendant who shot him three times more. The first of the four bullets entered Kerr's body from the front; the other three struck him from behind. Kerr, after running a short distance, fell and died. The defendant lodged in the basement of a house which stood in the neighborhood where the crime occurred.

The defendant was not arrested until Sunday, September 27, at 11:45 p. m. The officers who made the arrest were Harold Sammons and Berlin H. Yeomans, members of the first night relief of the Portland police bureau. Seemingly, when the officers made the arrest they did not suspect the prisoner of this homicide. The following night, however, while questioning him concerning another matter, he told them that he was the one who killed Kerr. According to the officers, the defendant took them to the scene of the crime and

showed them how he committed it. The demonstration was not completed until the early morning of September 29 and then the three returned to police headquarters. When the day relief came on duty, John E. Abbott and William J. Nelson, two members of the detective division who serve on the day relief, read the report filed by Sammons and Yeomans. They then spoke to the defendant and when they discovered that he was willing to confess his guilt they sent for a deputy district attorney. The deputy district attorney who responded was Sidney L. Hayes. He brought with him John S. Beckwith, a court reporter. The questions that were put to the defendant and the answers that he made were transcribed by the court reporter and were read from the witness stand. Two of the questions and answers follow:

"Q. You are making this statement freely and voluntarily and of your own free will, and without any promise of reward or threats and without any force or coercion, are you?

"A. Yes, sir.

"Q. You want to tell everything that happened. That is my understanding, is it?

"A. Yes, sir."

As a witness, the defendant freely conceded that those questions were put to him and that he made the answers just quoted.

Sammons, Yeomans, Abbott and Nelson also testified. They repeated the statements which they said the defendant made to them upon the occasions which we have already mentioned. Their statements and the one transcribed by Beckwith harmonize in all material details.

■ When the confession was offered through the four officers and the reporter's notes, no objection was

made by the defendant. Thus, he conceded the admissibility of the confession: Wigmore on Evidence, 3d ed., § 861. Later he and the aforementioned Pat Gray gave testimony which was intended to show that the confession was not true.

According to the purported confession, the defendant came to Portland from Missouri in July, 1942, and worked in the shipyards. August 29, at about 1:00 a. m., while he was standing in front of The Ballot Box, an eating place on Weidler Street, he was approached by the deceased, Richard Kerr, who "asked me about some colored girls." The defendant, according to his confession, told Kerr, "You get on away from me." Then some words passed between the two men. We revert to the confession:

"So he went to reaching after his hip pocket, and I didn't know what he was reaching for, you know, and I had the gun on me there at the time. * * * Well, I didn't see what he was trying to pull out. I shot before he - - -.

"Q. How far away were you from him when you shot?

"A. As far as from here to that table.

"Q. About four feet or five feet?

"A. Standing right in front of me, just right there. When I shot the first shot he was standing face toward me."

According to the confession, Kerr then started to run, pursued immediately by the defendant who shot him three times in the back. The purported confession states that the defendant ran home after firing the three shots at the fleeing man and without noticing that Kerr had fallen. This review of the confession suffices for present purposes.

A number of people besides the defendant lived in the dwelling house where he lodged. In its basement were seven beds and a quantity of trash consisting in part of empty boxes. The defendant occupied one of the beds. October 11, after the defendant's arrest, Mrs. Hazel Powell, who lived in the attic of the house, went to the basement to obtain some of the empty boxes which she purposed to use as fuel for her stove. When she picked up one of the boxes she saw in it a pistol. The police had searched the basement on a previous occasion and, seemingly, due to that fact Mrs. Powell, upon finding the gun, took it to her landlady, Stella Mack, who promptly telephoned for the police. Shortly, the aforementioned Sammons and Yeomans arrived and took the gun. The state contends that it is the lethal weapon.

After his indictment, the defendant was arraigned October 26 before the Honorable Martin W. Hawkins, a judge of the circuit court. The arraignment order states that the defendant plead not guilty. According to the testimony of the court reporter who serves Judge Hawkins' department, the defendant was asked at the time of his arraignment:

"What is your plea to that indictment?"
Quoting now from the testimony, we have:

"Mr. Cunningham's reply was, 'Self defense' and Judge Hawkins said, 'Not guilty is your plea, then?' and his answer was, 'Self defense, yes.' Mr. Hayes (deputy district attorney) then said, 'I presume if he stands mute the court will enter a plea for him,' and Judge Hawkins said, 'Not guilty, with a plea of self defense.' "

The entry of the plea as it appears in the record, not guilty, conforms to the limitations imposed by § 26-842, O. C. L. A.

We observe that twenty days before the trial defendant's counsel served a notice upon the district attorney, stating:

"You are hereby notified that the defendant herein, in addition to his plea of not guilty already entered herein, will also interpose the plea of not guilty by reason of insanity."

We assume that the notice was prompted by the requirements of § 26-846, O. C. L. A.

The above is stated, not for the purpose of setting forth a complete portrayal of the incidents of the homicide and trial, but only to serve as a background for the consideration of the assignments of error to which we shall now proceed.

■ The first assignment of error is based upon four exceptions which the defendant saved when Dr. Joseph Beeman, a witness for the state, testified. Dr. Beeman, who is a physician and director of the state's crime detection laboratory, testified that, in response to a call, he visited the morgue August 29, 1942, at 9:30 a. m. There he saw Kerr's body, fully clothed, lying upon the preparation table. After removing the clothing he performed an autopsy. He testified:

"And essentially this man had four bullet wounds in his body. One measured a quarter by one-eighth inch in diameter, two inches to the right of the midline, and forty-six and a quarter inches above his heel, approximately in the position I am pointing to. This bullet wound had gone downward and backward and had torn the large vessel leading from the heart, and the man had bled to death from this wound. He had a second wound which barely skimmed the edge of the right elbow forty-two inches above the heel—"

At that point defendant's counsel interrupted with an objection which declared that the witness "having told

what wound the man died from," mention of other wounds was irrelevant. We pause to observe that Dr. Beeman testified that the bullet just described entered from the front and went into Kerr's chest. As the objection indicated, Dr. Beeman said that this wound was the actual cause of death. He added that that bullet "had torn this large artery, the aorta, and that was the actual cause of death." He did not know whether that injury was inflicted by the first bullet fired or by one of the others. Concerning the other three wounds, he said:

"These other wounds, I believe, would have hastened death due to shock."

After the objection was overruled, Dr. Beeman described what he termed the second wound. He said that, after skimming the edge of the right elbow, the bullet "entered the right back, the right side of the flank, * * * it had entered the skin and slid underneath the skin and come out on the front of the abdomen * * *." The third bullet, according to Dr. Beeman, "entered the back * * *. This bullet has gone downward and forward and it lodged in the deep muscles of the back." The fourth wound "went directly along the left forearm for a distance of about approximately five inches, and here a bullet was found next to the bone."

As we have indicated, Dr. Beeman did not know the order in which the shots were fired. His use of first, second, and so forth, indicated merely the order in which he described them. At the time he gave his testimony the evidence did not indicate which of the shots was fired first, but it later became evident that the bullet which entered Kerr's chest was the first one fired.

Before considering the merits of the objection that the testimony concerning the second, third and fourth wounds was inadmissible, we shall mention other evidence which the defendant attacks by this same assignment of error. It will be remembered that he groups five exceptions within this single assignment.

Dr. Beeman identified a shirt which he said he took off the body of the deceased before the autopsy. Its material was white and bore some blood stains. In its front was a hole which Dr. Beeman said was made by a bullet. He added that the hole was in the "same general position" as the bullet wound in Kerr's chest. At that point the defendant objected that the testimony just mentioned "has no bearing upon the case" and that it was "of gruesome character and useless, prejudicial." Then the shirt was offered in evidence. The objection preceded the offer. After it was overruled, the shirt was received as an exhibit. After that course had been pursued and Dr. Beeman had identified a dark area around the bullet hole, he gave the following testimony:

"On the top of the bullet hole are some speckled dots which are different than this blood, and those specks are caused by unburnt powder, gun powder, residue from smokeless powder. * * * The majority of the spots are approximately two or three inches above the bullet holes."

He expressed a belief that when the gun was fired it was "closer than two feet" from Kerr and that it was fired from a position higher than the level of the wound. He thought that Kerr must have been stooped over when the gun was fired.

Next, Dr. Beeman identified a dark brown coat which he said "was taken from the body" of the deceased. He said that it showed the direction of one of

the bullets that entered the deceased's body and bore markings of two others. At that point the coat was offered as an exhibit and was received over the objection: "No relevancy; immaterial." Thus, we have the third exception.

After the receipt of the coat, Dr. Beeman produced what he described as an "infra-red photograph of the coat." He explained:

> "We use infra-red film and filter, because this is a real dark coat, and around the edges of those bullet holes is a dark smudge of grease. You would have quite a time seeing it on the original coat, but it shows up in this photograph."

The witness declared that the photograph showed, better than the coat, the manner in which the bullets entered the deceased's body. The defendant's objection to the photograph was:

> "The jury can see that coat as well as a photograph, and understand it just as well."

That objection is the basis of the fourth exception.

Referring to the coat and the photograph, Dr. Beeman testified:

> "And in the left elbow is another hole with a smudge which is pretty well around the hole, indicating that the bullet has hit that cloth at not too much of an angle, that is, some place near straight on. These show up in the photograph better than they do on the original coat."

He gave other testimony of like kind in an endeavor to show the likely angle at which the gun was fired. The photograph shows no smudge around two of the holes. The absence was due, according to Dr. Beeman, to the fact that a bullet, after entering the sleeve of Kerr's coat and leaving a smudge spot, came out at

the other side of the sleeve and then entered Kerr's body. It left no smudge at either of those two places.

The fifth exception upon which this assignment of error is based was saved when Dr. Beeman was permitted to answer the following question over the defendant's objection that the question was leading:

"Now, that coat doesn't show the path that was taken by what you term the fatal bullet, does it?"

The witness answered:

"No, sir."

To render this situation understandable, we add that after the answer had been made he was next asked:

"That is shown by the shirt, is it not?"

He answered:

"Yes, sir."

We now face the question whether error was committed when any of the above five rulings were made. When the procedure which we have just reviewed was pursued, the defense of an alibi had not been mentioned. The plea of not guilty was before the court. It had been amplified by the word "self-defense" voiced by the defendant when he was asked for his plea at the time of his arraignment. It had also been amplified by the formal notice which his counsel served: "Not guilty by reason of insanity."

■ The plea of not guilty imposed upon the state the burden of proving every element of the crime of murder. Thus, it was incumbent upon the state in order to establish its right to the verdict which the jury returned, to prove that the defendant killed Kerr "purposely and of deliberate and premeditated malice." Section 23-401, O. C. L. A. That section of our laws which incorporates those elements mentions an alternative to purposeful,

deliberate, premeditated, malicious killing, but this case is not concerned with the alternative. Section 23-402, which defines murder in the second degree, demands that the killing be done "purposely and maliciously" but omits the elements of deliberation and premeditation. It affords an alternative to purposeful, malicious killing, but this case is not concerned with the alternative. Manslaughter, according to § 23-405, O. C. L. A., consists of a voluntary killing "upon a sudden heat of passion caused by a provocation ＊ ＊ ＊." It omits malice, whether express or implied. All three of those degrees of the crime of homicide were embraced within the charge upon which the defendant was tried.

 Concerning the evidence challenged by these five exceptions, the defendant's brief says:

"They did not serve to elucidate or to explain the testimony of the witnesses, nor did they aid the jury to a better understanding of any of the issues in the case, and were harmful instrumentalities for use as evidence against the defendant, without being useful, in a legitimate sense, for the state."

That is the essence of the defendant's argument.

Section 2-406, O. C. L. A., lists as conclusive presumptions:

"(1) An intent to murder, from the deliberate use of a deadly weapon, causing death within a year; (2) a malicious and guilty intent, from the deliberate commission of an unlawful act, for the purpose of injuring another."

The presumed intent or malice authorized by that section is sufficient for the establishment of second, not first, degree murder: *State v. Carver,* 22 Or. 602, 30 P. 315. The state, however, is never compelled to content itself with presumptive intent or malice; it may,

if it can, go on and establish express intent. And, of course, the state is never required, when an indictment charges first degree murder to content itself with second degree murder. To establish first degree murder there must be actual proof by direct or circumstantial evidence that the killing was committed with deliberate and premeditated malice. None of the so-called conclusive presumptions mentioned in § 2-406, O. C. L. A., establishes the element of deliberate and premeditated malice: *State v. Carver,* supra; *State v. Gibson,* 43 Or. 184, 73 P. 333; and *State v. Jancigaj,* 54 Or. 361, 103 P. 54. Even if malice is proved or presumed, premeditation must be established as a fact.

The question, therefore, occurs whether the evidence concerning wounds two, three and four, assuming that the first wound was fatal and that the defendant inflicted it, showed malice, deliberation, purpose or premeditation.

■ Regardless of what may have been excluded in bygone times, it is well established today that in homicide cases, as in all others, all evidence which is material and relevant, and which violates none of the exclusionary rules, is admissible. Hence, if mention of wounds two, three and four, and a description of the course the bullets took which inflicted them, could establish any of the needed elements, the evidence previously reviewed was admissible.

From I Hale's Pleas of the Crown (1st Amer. ed.), p. 452 (note), we quote:

"Malice may also be inferred from the instrument used, the mode in which the weapon was obtained and selected, especially if it was the best choice for the purpose; the manner, too, in which the weapon was used, the repetition of dangerous wounds, the choice of vital spots for those wounds,

and the perseverance in the assault until death be produced; these are all circumstances indicative of malice. Deliberate malice may also be seen in the mode of attack, the time selected for it when the victim is off his guard, when he has no opportunity for self defense, when stabs are given from behind, pursuing a man, * * * also show calculation, deliberation, and malice.''

In *State v. Carver,* supra, Mr. Justice ROBERT BEAN said:

"The weapon used, and the manner of its use, are important facts for the consideration of the jury in determining the degree of guilt, but are not conclusive evidence of deliberation and premeditation.''

The repeated shooting of an individual with a deadly weapon is evidence that the gun was used intentionally and deliberately; that is, not inadvertently: Wigmore on Evidence, 3d ed., § 302. The repeated shooting into vital places of the body of another is evidence, in states where an intent to do no more than wound does not suffice, that the one who fired the gun wanted to kill his victim and not merely wound him: *Commonwealth v. Millien,* 291 Pa. 291, 139 Atl. 851. No citation to authority is required to warrant the statement that the three bullets which struck Kerr in the back indicate that they were not fired in self-defense. The fact that a person is repeatedly shot after he has been so mortally wounded that he will shortly die evidences anger or malice and refutes justifiable purposes: II Warren on Homicide, perm. ed., p. 317. The act of one who pursues a fleeing person whom he has mortally wounded and shoots him three times more may properly be deemed brutal and depraved. From a killing performed in a brutal manner or one indicative

of deliberate malignity, a jury may infer malice: I Warren on Homicide, p. 309; 29 C. J., Homicide, p. 1099, § 73, and annotation 38 L. R. A. (NS) 1086.

We are satisfied that no error was committed when the first of the above-described rulings was made; that is, when Dr. Beeman was permitted to go on and describe wounds two, three and four.

As we said, the second group of rulings challenged by the assignment of error under review are the three which received as evidence Kerr's shirt, his coat and the infra-red photograph of the coat. All three of these objects served, in addition to others, the same purpose as the evidence which pointed out the location of the wounds. The coat clearly shows that three shots were fired from behind. The three objects were therefore relevant.

When the shirt was offered as evidence, the defendant objected on the ground that it was "of gruesome character and useless, prejudicial." The shirt was made of white cloth and here and there it bears blood stains which are not large. Seemingly, Kerr's coat was open when the first shot was fired and thus it did not pass through the coat. The latter was pierced by only three of the shots. Since the smudge particles left by the bullet which entered from the front were only upon the shirt and not upon Kerr's body or coat, the shirt was relevant if the smudge spot was indicative of any fact material to this case. Dr. Beeman, it will be recalled, testified that since the smudge preponderated above the bullet hole, and not below it, the shot was probably fired while Kerr was bent over. The jury, in determining whether the defendant shot in self-defense, was entitled to know whether Kerr stood upright when the shot was fired or was stooped over.

Thus the shirt with its bullet hole and powder marks was relevant to an issue in the case.

■ We have examined both the coat and the shirt. We do not believe that either is gruesome. Nothing connected with a murder trial—guns, bullets, blood-stained clothing—is pleasing to the eye or touch; but the shirt and coat do not provoke sympathy for the deceased nor cry out for reprisal. If either could be deemed gruesome, that circumstance in itself would not have excluded it from reception as evidence: *State v. Nelson,* 162 Or. 430, 92 P. (2d) 182; *State v. Weitzel,* 157 Or. 334, 69 P. (2d) 958; *State v. Weston,* 155 Or. 556, 64 P. (2d) 536, 108 A. L. R. 1402; and Wigmore on Evidence, 3d ed., § 1157. Those authorities we deem controlling rather than *State v. Miller,* 43 Or. 325, 74 P. 658, upon which the defendant relies. It follows from the foregoing that no error was committed when the shirt and the coat were received as evidence.

■ The defendant does not claim that the photograph of the coat is inaccurate or fails to faithfully portray the coat's condition. It will be recalled that Dr. Beeman made the infra-red photograph of the coat because photographs of that kind show spots on dark material which would otherwise be difficult of detection. Both the photograph and the coat are before us as exhibits. It is a matter of almost daily observation that photographs, timely made, can help materially in getting at the facts of a case, and it would be nothing less than folly for the courts in their quest for the truth to disregard the help which any science offers. We have mentioned the defendant's single objection to the introduction of the photograph: "The jury can see that coat as well as a photograph, and understand it just as well." We are satisfied that the objection is

based upon a misconception of what the infra-red photograph reveals. It was properly overruled.

■ The only other exception which forms a part of the assignment of error now under review is the one based upon the question put to Dr. Beeman: "That coat doesn't show the path that was taken by what you term the fatal bullet, does it?" The objection was that the question was leading. The question was leading (Wigmore on Evidence, 3d ed., § 772) but we deem that fact inconsequential. Many times leading questions are permissible: § 4-706, O. C. L. A. Dr. Beeman's previous testimony had made it clear that the fatal bullet (the one fired from in front) did not pass through the coat—it passed only through Kerr's shirt before it entered his body. The above question, to which the objection now under consideration was made, was a mere summary or review for the purpose of making clear a fact which had already been developed; a fact indeed which anyone could ascertain for himself by inspecting the shirt and the coat.

The above, being the first, assignment of error is without merit.

Believing that convenience will be promoted, we shall now pass on to the fifth and other assignments of error before considering assignments two, three and four.

■ The fifth assignment of error is based upon a ruling which permitted Stanley MacDonald, a ballistic expert, to answer this question:

"Now, would the path that a bullet had taken through the body and the condition of the bullet found afterward have something to do with your ability to identify it?"

Mr. MacDonald was a witness for the state. The defendant's sole objection to the question was that it was leading.

Dr. Beeman, in making the autopsy, recovered from Kerr's body the four bullets which we have already mentioned. Upon recovering them he placed them in envelopes bearing numbers corresponding to those he employed in identifying the wounds, that is, one, two, three and four. Later the four envelopes and the bullets contained in them were delivered to MacDonald who examined the bullets for the purpose of determining whether they were fired from the gun which Mrs. Powell found in the basement where the defendant lodged.

Before the challenged question was asked, MacDonald had testified that the inside of no gun barrel is perfectly smooth. To the contrary, according to him, the inside of every gun barrel bears ridges, lines, grooves and other imperfections which make corresponding marks upon the periphery of any bullet that passes through the barrel. MacDonald swore that no two gun barrels bear precisely similar imperfections, and therefore the markings they leave upon bullets fired through them serve as finger prints which identify the gun, unless something has interfered and rendered the markings too vague for observation. After he had given these explanations and had described the intricate apparatus which he employed in making his examinations, he testified that bullets one and two were fired from the gun which was delivered to him. He next swore that the markings upon bullets three and four were too shallow to enable him to determine whether those bullets were fired through the same

gun. Then came the challenged question, and after the objection had been overruled, he answered:·

> "It might have some effect on the markings of the bullet because of the fact that the bullet is a soft lead bullet."

The form of the question was leading, but § 4-706, O. C. L. A., assigns the form of the question to "the sound discretion of the court" and authorizes the use of leading questions on direct examination if that form will promote the "interests of justice." We know of no abuse that is indicated by the course that was pursued. The answer indicates that the witness was not led. Moreover, upon cross-examination, the subject was developed at some length. For instance, defendant's counsel asked MacDonald:

> "Well, how could you account for that change or those destructions? What would destroy the markings on a bullet that was made by the barrel of a gun?"

He answered:

> "The markings may be destroyed from the passage of a bullet through a human body or through the clothing or some such thing. * * *"

We are satisfied that this assignment of error is without merit.

■ The seventh assignment of error challenges a ruling which permitted the district attorney, in cross-examining Dr. W. C. Burkes, a witness for the defendant, to inquire of him as to the defendant's mental condition November 23, 1942. Dr. Burkes, who specializes in neurology and psychiatry, testified on direct examination that he examined the defendant as to his mental

condition on November 23, 1942. After he had so stated, the defendant's counsel next asked him:

"I wish you would state, if you can, Doctor, give us your opinion as to whether or not you found Harvey Cunningham to be a constitutional psychopath?"

It will be observed that the question mentioned no specific time except so far as the element of time was embraced in the words "constitutional psychopath." The witness answered:

"That was one of the diagnoses I made after my examination of him."

We quote further from the direct examination:

"Q. You did find him a constitutional psychopath?

"A. I believe him to be, yes.

"Q. And I will ask you to state whether or not that means a person with a diseased mind?

"A. It means basically that, an individual that is constitutionally inferior.

"Q. It means, constitutional psychopath means from birth he was a psychopath, is that it?

"A. That he was an inferior individual, congenitally so."

Defendant's counsel next asked Dr. Burkes:

"I will ask you if, on that date, whether you didn't or whether you did find him medically insane?"

What date defendant's counsel had in mind he did not indicate. The witness replied:

"I would classify him as insane medically, yes."

Next he was asked:

"Now state, from that diagnosis and opinion, if you could say that he was medically insane on August 29, 1942, as far back as August 29, 1942?"

The witness replied that he could not answer yes or no "without an explanation", and he thereupon was asked:

"Can you say,—you can't give a definite opinion that far back, then, as to whether from your diagnosis on the 23rd of November, you can't tell this jury whether he was, on August 29th, medically insane?"

The witness replied:

"I would say yes."

Upon cross-examination, the district attorney asked Dr. Burkes for his opinion concerning the defendant's mental condition on November 23, the day the examination occurred. The following is the objection that defendant's counsel made:

"That is objected to because we are not concerned with the legal insanity or sanity of this man except as of August 29, 1942."

The following is the answer the witness made:

"It was my opinion, after examining this man, and accepting the legal interpretation of insanity basically whether or not he was capable of determining right from wrong, I felt that from that point of view he was sane; that he was capable, on the date I saw him, of determining right from wrong."

Next he was asked for his opinion of the defendant as of August 29, and replied:

"If we accept the medical interpretation of insanity, as we do medically, I would say that he is an insane individual to this extent: In the first place, he is an inferior individual; he isn't up to par; never has been; never can be. In addition to that, he has syphilis, and I think perhaps an involvement of the central nervous system or of the brain."

Section 4-708, O. C. L. A., says:

"The adverse party may cross-examine the witness as to any matter stated in his direct examination, or connected therewith."

We believe it is evident that that rule was not violated when the defendant's objection was overruled. This assignment of error is without merit.

■ A ruling which received as evidence, over the defendant's objection, certified copies of three judgments entered in felony cases by the circuit court of the State of Missouri for Jackson County is the basis of the assignment of error to which we now proceed. In the first of these judgments the defendant's name was Harvey Cunningham; in the second and third his name was Howard Cunningham. In the first of those cases the sentence was imposed June 20, 1938; in the second, August 10, 1928; and in the third, February 28, 1926. The sentences imposed were, respectively, five years, fifteen years and two years.

Before the certified copies of the judgments were offered, the defendant had given his testimony, and upon cross-examination had testified in part as follows:

"Q. Now where did you live before you came to Oregon?
"A. I lived in Kansas City, Missouri.
 * * *

"Q. What were you doing in Kansas City during 1926?
"A. Well, I worked at a shoe shine parlor.
"Q. And what else?
"A. I washed dishes; done garage work * * *.
"Q. Did you ever at any time be known as, or go under the name of, Howard Cunningham?
"A. Well, sir, I have had my name mistaken, spelled lots of times like that.

"Q. Back there they called you by mistake at times Howard Cunningham?

"A. Yes, sir; yes, sir; I got letters coming to me lots of times that way.

"Q. Got letters coming to you as Howard Cunningham?

"A. Yes, sir; they would mistake it for Harvey.

"Q. Would the letters, though, finally be delivered to you if they were addressed to Howard Cunningham?

"A. Yes. sir.

"Q. And that would be during the time you lived in Missouri in the year 1938 and the year 1926?

"A. Yes, sir."

Kansas City is located in Jackson County.

At the conclusion of the above testimony the three judgment orders were offered as evidence. We understand that counsel for the defendant did not notice when the papers were proffered that in two of them the name of the defendant was Howard Cunningham. He made no objection based upon that circumstance, but objected "for the reason that they are not in proper form"; that for the purpose of discrediting the defendant the state was limited to one adverse judgment; and that it was necessary to first ask the defendant whether he had ever been convicted of a crime. We shall, nevertheless, consider the admissibility of these documents as though all available objections had been made.

After the objections had been overruled the three documents were received as evidence. Thereafter, although the examination of the defendant proceeded at length, he made no claim that he had never been convicted of the crimes indicated by the judgment records. We also observe that the aforementioned Dr. Burkes,

in answer to a question propounded to him by defendant's counsel, said:

"There is a history of him having spent eleven months in a psychopathic ward during the time he was in the penitentiary on one of his times."

■ The objection that the certified copies of the judgment orders were "not in proper form" was subsequently withdrawn. The objection that the state was limited to one adverse judgment, we are satisfied, is without merit. In *State v. Goodloe,* 144 Or. 193, 24 P. (2d) 28, this court said:

"The state is not limited to showing only one conviction." The objection that the judgment orders were not admissible until the defendant had first been questioned upon the subject is met by what was held in *State v. Brennan,* 111 Or. 479, 227 P. 275:

"It is not uncommon to attempt to prove a prior conviction by questioning the witness on the stand, but this is not a necessary prerequisite under the statute, * * *."

We come now to the question whether the judgment orders entered in the two cases against Howard Cunningham were admissible. It is true that the indictment in the present case entered this defendant's name as Harvey Cunningham. However, it will be remembered that he himself testified that he was known in Kansas City in the period of 1926 through 1938 by the name of Howard as well as by the name of Harvey.

Section 2-407, subd. 25, O. C. L. A., lists among other disputable presumptions "identity of person from identity of name." In *State v. Black,* 150 Or. 269, 42 P. (2d) 171, 44 P. (2d) 162, we analyzed at some length the nature of that presumption. California's Code of Civil Procedure enumerates a similar pre-

sumption. See Civil Procedure and Probate Codes of California (1941), § 1963, subd. 25.

From *People v. Rolfe*, 61 Cal. 540, we now quote:

"It is claimed, that there was not sufficient evidence to show that the defendant, Frank H. Rolfe, was the same party convicted in San Mateo County, under the name of 'Frank Rollins;' but we think that the evidence very clearly shows that he was. The witness Charles Aull testified that he was an officer in the State Prison at San Quentin from the year 1877 to the latter part of 1881, that during the whole of that period the defendant was an inmate of the prison, and was known by the name of Frank Rollins among the officers, as well as upon the records of that institution. Identity of person is presumed from identity of name."

The court at that point cited the section of the California code, of which § 2-407, subd. 25, O. C. L. A., is a duplicate. It then added:

"There were other circumstances in the case which tended to establish the fact that Frank H. Rolfe was the same person convicted in the County Court of San Mateo County under the name of Frank Rollins; but what we have already said on this point is sufficient."

It seems to us that the defendant's testimony above quoted conceded facts parallel to those established in the California case by the prison official.

In *People v. Sberno*, 22 Cal. App. (2d) 392, 71 P. (2d) 274, a judgment order against Frank Sberna was held admissible, although the defendant's name was Frank Sberno. See, in addition to the authorities reviewed in *State v. Black*, supra; *Hefferman v. United States*, 50 Fed. (2d) 554; *Clifford v. Pioneer Fireproofing Co.*, 232 Ill. 150, 83 N. E. 448; *People v. Law-*

*son,* 331 Ill. 380, 163 N. E. 149; *State v. Loser,* 132 Iowa 419, 104 N. W. 337; and *State v. Wooten,* 92 S. C. 61, 75 S. E. 212. The defendant's argument concerning the overlapping of the terms shown by two of the contested judgment orders is answered by what the court said in *People v. Schanda,* 352 Ill. 36, 185 N. E. 183, in dealing with an analogous problem.

■ We now quote from 23 C. J., Evidence, p. 57, § 1803:

> "Identity of name is sufficient in the first instance as presumptive evidence of identity of person. Since identity is more easily disproved than established, weakness of evidence in disproof tends to strengthen the evidence of identity."

Without doubt, the difficulty of establishing identity and the ease with which erroneous proof of identity may be swept aside is the basis of the presumption created by our code. As we have seen, the defendant made no effort to show that he was not the man named in the three challenged judgment orders. Far from so doing, one of his witnesses, Dr. Burkes, who possibly got his information from the defendant, confirmed the presumption of identity by speaking of the period "he (defendant) was in the penitentiary on one of his times." We are satisfied that this assignment of error possesses no merit. If the jury believed that the defendant was the party named in any of the three judgments, then the prior conviction was a discrediting circumstance: § 4-711, O. C. L. A.

■ We come now to the second assignment of error which is predicated upon a contention that a mistrial should have been declared when Harold Sammons, a witness for the state, volunteered the statement, "Well, there was another case that we had been talking to him

about." When the witness had proceeded that far, the defendant's counsel interrupted with: "Objected to, Your Honor; move to strike it and ask the jury to disregard it." The presiding judge promptly ruled: "I will strike the statement of the witness from the record and the jury will disregard it." Sammons was testifying as a witness for the state when this incident occurred. Before it took place he had stated that after Kerr's death he was assigned to investigate the homicide, that on September 27 he arrested the defendant, and that September 29 he talked to him "about this case." At that point, the district attorney asked Sammons: "Will you tell the jury what this conversation was, how it happened to come up?" It will be observed that the question was proper. Obviously, its purpose was to ascertain from Sammons what the defendant said "about this case." Unfortunately, Sammons began by saying, "Well, there was another case that we had been talking to him about." The defendant does not contend that the question was asked in bad faith, nor does he argue that Sammons made his remark out of bad motives.

As we have said, the officers did not suspect the defendant of this crime when they arrested him. Seemingly, they believed that he was involved in another crime. We gain that impression from an offer of proof made by the district attorney later in the trial when another question was pending. The offer was made in chambers out of the presence of the jury; nothing came of it. The fact that the defendant's arrest and questioning arose out of another matter possibly explains how it happens that Sammons commenced his answer to the above-quoted question with the disapproved words.

After the presiding judge struck the improper statement and instructed the jury to disregard it, the defendant's counsel moved for a mistrial. It was denied.

By reverting to Sammons' words, it will be observed that they disclose nothing about the other case which he started to mention; nor do his words imply that the defendant was guilty of something in that matter. That case, whatever may have been its nature, was never again mentioned in the trial, unless it was the one to which the district attorney's offer of proof referred.

From 70 C. J., Witnesses, p. 577, § 741, we quote:

> "A voluntary statement by a witness, not responsive to a question, should be stricken, unless such statement would be otherwise admissible or would be proper if an answer to a question. Whether or not upon an improper voluntary statement of a witness a mistrial should be declared is largely within the discretion of the trial judge."

*People v. Rozewicz,* 228 Mich. 231, 199 N. W. 632, was based upon an incident almost the counterpart of the one before us. The trial court pursued a course exactly similar to the one now under review. See also *People v. Podsiad,* 295 Mich. 541, 295 N. W. 257, where the volunteered answer was:

> "My meeting with Mrs. Podsiad was, I believe, five years ago, when she was first arrested for pandering—with her attorney."

The order of the lower court which directed the jury to disregard the remark, but denied a motion for a mistrial, was affirmed. The decision said:

> "The rule is different where the prosecutor is to blame for the impropriety."

*State v. Shull,* 131 Or. 224, 282 P. 237, 71 A. L. R. 1498, which the defendant cites, recognizes that the matter of dealing with non-responsive answers is assigned largely to the discretion of the presiding judge. In that case the judgment of guilt was affirmed.

 Normally, striking an answer from the record and instructing the jury to disregard it suffices. Common experience indicates that that remedy takes care of most situations. If every unresponsive answer demanded a mistrial, the administration of justice would be greatly hampered. The defendant, in now contending that the volunteered answer was so prejudicial that nothing short of a mistrial sufficed, ought to be in a position to point to something in the answer which discloses that it was peculiarly prejudicial. The burden rests upon him of showing that the presiding judge exercised his discretion erroneously. Nothing said in the defendant's brief indicates that Sammons' volunteered answer was of the character so hurtful that the trial judge's instruction to disregard it was inadequate. Throughout the trial the presiding judge displayed an alert regard for the defendant's rights. The manner in which he performed his functions must not only have influenced the jurors to demean themselves similarly, but must have won for his instructions ready acceptance. We believe that his instruction to the jury to disregard the words were obeyed, and therefore a mistrial was not necessary. It is our belief that this assignment of error is without merit.

 We shall now consider the third assignment of error. It is predicated upon a ruling which denied a motion for a new trial based upon the fact that four of the jurors, after they were impanelled, read newspaper accounts concerning the beginning of the trial. Three

of the jurors read an account which appeared in The Oregonian, Portland's morning newspaper, and the fourth read an account which appeared the preceding afternoon in the Oregon Journal. The account which The Oregonian published appeared upon page eleven of the paper and had the following headlines:

"MURDER TRIAL UNDER WAY
NEGRO CHARGED WITH SHOOTING"

The article follows:

"Trial of Harvey Cunningham, 38, Negro, charged with first degree murder, opened Monday in Circuit Judge James W. Crawford's court.

"Cunningham, ex-convict, who came to Portland from Missouri last summer to work in the shipyards, is accused of fatally shooting Richard F. Kerr, 36, of 2202 N. E. Everett street, early on the morning of August 29, at N. E. Weidler street near Victoria avenue.

"Kerr was shot four times as he attempted to flee from the alleged slayer. The shooting following a quarrel between the two men, according to police.

"Chief Criminal Deputy District Attorney T. B. Handley and Deputy Clarence M. Potts are prosecuting the case. Elton Watkins is defense attorney.

"*Doctor Takes Stand*

"A jury of nine men and three women was selected. After the jurors visited the scene of the shooting in the afternoon, the state started presentation of evidence.

"Among the witnesses called was Dr. Joseph F. Beeman, administrator of the state crime laboratory, who performed the autopsy on Kerr's body. He traced the course of the bullets that caused Kerr's death."

The Journal account was also published upon an inside page. It was shorter than that in The Oregonian

and mentioned no fact omitted by The Oregonian. When it was published no witness had yet been called, and hence no reference was made to Dr. Beeman's testimony. It, like The Oregonian account, termed the defendant an ex-convict.

Seemingly, these articles had escaped the attention of the attorneys, for it was the presiding judge who called their attention to them. He did this in his chambers out of the presence of the jury. Defendant's counsel, upon seeing the articles, deemed the appellation "ex-convict" prejudicial to the defendant and moved for a mistrial. After some colloquy, the presiding judge, the defendant and counsel re-entered the courtroom and there the presiding judge, addressing the jurors, inquired:

"May I ask you ladies and gentlemen of the jury whether any of you read anything about this case in last night's Journal or this morning's Oregonian or this afternoon's Journal?"

Two of the jurors replied that they read the Oregonian article. One said that he read a part of it and the fourth answered that he read the Journal account. All of them, in reply to questioning by the trial judge, answered that the articles would not influence their consideration of the case. For instance, one, speaking of the Oregonian account, said: "Nothing that impressed me as bearing upon our responsibility in the crime." The one who read the Journal item, when asked if he could recall what he read, replied: "I don't think I could right now, no." Still another, who recalled what he read in The Oregonian, said "no" in reply to the question: "Would it in any wise enter into your consideration of the question of the guilt or innocence of this man?" The fourth juror, who had read a part of

the Oregonian article, said it made no impression upon him. After that procedure was concluded, the trial judge asked all four:

"I will ask you again, individually, if you can entirely disregard whatever you read and any impression that you gained at the time, if any, and forget about it entirely so far as the consideration of the merits of this case is concerned."

All answered "yes." Then judge and counsel retired to chambers where a discussion ensued. Shortly the motion for a mistrial was denied. After judge and counsel re-entered the courtroom, the jury was charged:

"* * * I will ask none of you from now on to read anything in the papers about this case. Should you run across it, why, you will, of course, avoid reading it, and continue with the trial of the case on that basis. I instructed you at the beginning of the trial that you not discuss the case among yourselves or with anyone else, and I will repeat that instruction at this time. And I will ask those of you who did read the papers not to discuss with anyone else, any juror particularly, or anyone, the articles that you read, even if you recall such articles. This is a precautionary matter which I am bringing to your attention in order to avoid the necessity of locking you up until the case is finally completed."

The only detail contained in the articles which may be untrue is the newspaper statement that Kerr was shot four times as he attempted to flee. It may be that the first shot was fired before he turned to flee. The defendant, however, does not mention that detail. He complains because the articles branded him as an ex-convict before the evidence concerning that fact was presented.

Manifestly, it is the duty of a juror to be impartial. When the state charges a person with a crime it

throws about his trial a protective screen which is intended to exclude from the jurors all information about the case except the evidence which comes from the witness stand. Restricting the source of the facts to the witness stand is especially important in felony cases; in them the defendant "must be present in person" during the entire course of the trial. Section 26-904, O. C. L. A. A case cannot be tried partly in the courtroom and partly in some other place. If, in order to shield them from unauthorized communications, it becomes necessary to withdraw the jurors from the public, the trial judge possesses the necessary power and should exercise it. But whether the jurors are withdrawn from the public or not, the trial judge always possesses power to secure for the defendant an impartial trial.

He may, if his discretion prompts him so to do, declare a mistrial.

In *United States v. Joseph Perez*, 9 Wheat. 579, Mr. Justice Story said:

"But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound and conscientious exercise of this discretion, rests, in this case, as in other cases, upon the responsibility of the judges, under their oaths of office."

Under such circumstances, the declaration of the mistrial, as Mr. Justice Story pointed out in the decision mentioned, will not prevent the defendant from being retried.

From 64 C. J., Trial, § 797, p. 1015, we quote:

"Although it has been said that jurors should not, during the course of the trial, be permitted to read newspapers containing comments on the issues in the case on trial, and newspapers have no more

right than any other person to attempt to influence the decision of the jury, it is usually held that the fact that jurors have read newspaper accounts or comments, which are not of a highly damaging character or inspired by a party to the suit, is not of itself ground for reversal, or such misconduct as to require the trial court to withdraw or discharge the jurors in the case, it being largely within the courts' discretion whether or not the jurors will be withdrawn or discharged; * * *''

In *State v. Brown*, 7 Or. 186, it appeared that while the jury was being impanelled in the circuit court a newspaper published:

"The trial of Brown, the principal murderer in the O'Shea-Joseph tragedy was called in the circuit court. The afternoon was consumed in marching in citizens to serve as jurymen, most of whom were quickly bounced."

The decision said:

"We can not conceive how a juryman possessing common sense could be influenced in any way, either for or against the defendant, by reading that paragraph. The statute says: 'Neither a departure from the form or mode prescribed by this code in respect to any pleadings or proceedings, nor any error or mistake therein renders it invalid, unless it has actually prejudiced the defendant or tend to his prejudice in respect to a substantial right.' (Crim. Code, 362, sec. 170.)"

The statute is now § 26-1401, O. C. L. A.

In *State v. Weitzel*, 157 Or. 334, 69 P. (2d) 958, it appeared that "some juror found in the jury room a newspaper clipping concerning the general demeanor of some lawyers in criminal trials and the inclination of some persons charged with crime to repudiate a confession." In sustaining the order which denied the defendants' motion for a new trial, the decision said: "We

think the jury was not influenced in reaching its verdict in the instant case by reason of the newspaper clipping.''

It is evident that in each of those two cases the trial judges exercised the discretionary power mentioned by Justice Story and Corpus Juris. Since the power was a discretionary one and no abuse of it was indicated, the orders in each of those cases were sustained.

In support of his contention that reversible error was committed when his motion for a mistrial was denied, the defendant cites: *Frint v. Amato,* 131 Or. 631, 284 P. 183; *State v. Brown,* 7 Or. 186; *Mattox v. United States,* 146 U. S. 140, 36 L. Ed. 917, 13 S. Ct. 50; *People v. McCoy,* 71 Cal. 395, 12 P. 272; *People v. Stokes,* 103 Cal. 193, 37 P. 207, 42 Am. St. Rep. 102; *People v. Wong Loung,* 159 Cal. 520, 114 P. 829; *State v. Caine,* 134 Iowa 147, 111 N. W. 443; *Capps v. State,* 109 Ark. 193, 159 S. W. 193, 46 L. R. A. (N. S.) 741, Ann. Cas. 1915C, 957; *Sprinkle v. State,* 137 Miss. 731, 102 So. 844; *Styles v. State,* 129 Ga. 425, 59 S. E. 249, 12 Ann. Cas. 176; *Perry v. The People,* 63 Colo. 60, 163 P. 844, L. R. A. 1917D, 921; *Woodward v. Leavitt,* 107 Mass. 453, 9 Am. Rep. 49; and Thompson on Trials, 2d ed., § 2561.

We found nothing in the textbook just cited which throws any light upon the issue before us. The question in the Woodward case was not whether a mistrial would be warranted had it appeared that a juror read a newspaper account of the trial, but whether a juror's testimony was admissible in support of a verdict attempted to be impeached by other evidence.

In the Perry case, the defendant filed affidavits at the close of the state's case which stated that his defense was subjected to great prejudice by the circu-

lation of untrue reports to the effect that the sheriff, the night before, discovered in the defendant's cell, files, saws, a club and a dagger, by the use of which the defendant planned to escape from his cell and kill anyone who attempted to prevent him from so doing. The affidavits stated that the reports were inspired by the sheriff, district attorney and special prosecutor. They averred that those same individuals caused the report to be published in a newspaper under heavy black headlines and in a sensational manner. According to the affidavits, a copy of the newspaper was placed in the jury room immediately prior to the jurors' entry therein. Based upon the affidavits, the defendant moved for a mistrial. Without making any investigation, the trial judge denied the motion, but, upon return of a verdict of guilt, polled the jury. All the jurors admitted that they heard the reports while the case was pending before them, and some answered that they saw the newspaper article. No counter-affidavits were filed.

In the Styles case, after the jury was impanelled, a newspaper published an editorial based upon a statement made by the solicitor general. The statement was quoted at length. According to the decision:

> "An examination of the editorial will show clearly that it is argumentative in favor of convictions in capital cases such as the one on trial. Either a casual or a most scrutinous reading of the article will lead to that conclusion, and to none other. It was not only argumentative, but almost of coercive character, in that it criticized juries for failure to convict. The charge inferentially made was that the conditions in this country were such that jurors would not convict in murder cases 'even where the evidence of guilt was overwhelming.'"

We have already quoted the holding in the Brown case. In the Frint decision, this court, in sustaining an order which declined to declare a mistrial, said:

> "There is no showing made to the effect that any of the jurors sitting in the trial of the case had seen the articles or either of them or that they or any of them had any knowledge thereof."

In the Mattox case, while the jurors were deliberating, the bailiff told them that upon another occasion the defendant tried to poison a man, and that "this is the third fellow he (defendant) has killed." Also during the deliberations a newspaper was introduced into the jury room which said that the defendant was once before tried for his life, that the evidence against him in the present case was very strong, that his friends had given up hope for an acquittal, and that it was not thought that the jury's deliberations would last more than an hour.

In the Stokes case, the newspaper article included an item of evidence which the court had rejected as inadmissible, and made an intimation that two of the jurors were corrupted.

In the Wong case, the jurors read a newspaper article which said that the defendant was "convicted before Judge Lawlor of San Francisco for the crime of murder and sentenced to 99 years in prison. The supreme court granted a mistrial owing to errors in the instruction of the court to the jury. Before the defendant could be tried a second time the earthquake and big fire occurred, and the records in the case were destroyed."

The McCoy decision affirmed an order denying a motion for a new trial. Seemingly, the motion was based upon misconduct of jurors but the grounds of the

motion were not embodied in the bill of exceptions. For that reason the order was affirmed.

In the Caine decision, the newspaper accounts of the trial "were written in a somewhat sensational manner" and consisted in part of facts "not shown by any evidence in the case."

In the Capps case, in which some of the testimony given against the defendant came from his children, the decision said:

"These articles were prejudicial, because they were not a mere narration of the evidence connected with the trial which had occurred within the view of the jury, and that their necessary effect was to convey to the jury the information that public sentiment had crystallized into the conviction that appellant was guilty of the horrible crime of which he was charged; that his children had stood the ordeal of a searching cross-examination, and yet remained firm because, as intimated by the papers, their story was true."

In the Sprinkle case, the jury, after spending a night in deliberation, stood eleven for conviction and one for acquittal. The next morning they obtained a newspaper which informed them, according to the decision, about several matters

"about which testimony could not have been introduced, namely, of the appellant's being a conspicuous figure in the court records of Harrison County, also of his being charged with highjacking a cargo of liquor * * * also of his killing a Negro and pleading self-defense and also of mass meetings by the citizens of Pass Christian in an effort to remove him from the office of city marshal."

Upon the next ballot all twelve jurors voted for the defendant's conviction.

Now, for a summary of those decisions. The Brown, Woodward, Frint and McCoy decisions throw no light upon the issue pending before us. In the Perry case the rumors and newspaper article which came to the attention of the jurors were highly prejudicial to the defendant. In the Styles case the editorial which the jurors read was virtually a plea for a conviction. In the Mattox, Stokes, Wong, Caine, Capps and Sprinkle cases, the facts which the newspapers reviewed would have been inadmissible as evidence had they been offered; in fact, as one of those decisions said, a mere asking of questions by the prosecution which insinuated the existence of such facts would have been misconduct. In all of the cases upon which the defendant relies, with the exception of the Perry case, the jurors' misconduct remained undetected until after the jury had been discharged.

*State v. Adamo,* 128 Wash. 419, 223 P. 9; *People v. Lubin,* 190 App. Div. 339, 179 N. Y. S. 691; and *People v. Craver,* 174 Misc. 325, 20 N. Y. S. (2d) 533, upon which the state relies, employed the principle stated in the excerpt which we quoted from Corpus Juris. In the Lubin case the trial judge discovered during the course of the trial that some of the jurors had read a newspaper article which described the defendant as an habitual drunkard. He thereupon adopted a course similar to the one pursued in the instant case. His ruling denying a mistrial was affirmed. In the Craver case, a newspaper item published during the course of the trial stated that the defendant was previously convicted of a felony. The district attorney called the trial judge's attention to the article and moved for a mistrial. Over the defendant's objection the motion was allowed. After the mistrial had been declared,

the defendant instituted the habeas corpus proceeding under review to be freed from incarceration. In sustaining the writ, the court held that the article was not necessarily prejudicial to the defendant.

In *United States v. Marrin,* 159 Fed. 767, affirmed in 167 Fed. 951 (writ of certiorari denied, 223 U. S. 719, 56 L. Ed. 629, 32 S. Ct. 523) the defendant was convicted of a conspiracy to defraud by the use of the mails. From the district court's decision, it appears that the trial began September 23, and newspaper comment was published daily September 23 to and including October 3. October 3 the defendant moved for a mistrial on the ground that the comment in one of the papers was so unfair, distorted and biased in favor of the government as to render a fair trial impossible. The decisions of both the district court and the circuit court of appeals agreed that the comment was of the type indicated by the defendant. According to the district court's decision: "At the suggestion of his (defendant's) counsel, each one of the jurors was interrogated as to whether he had read the articles published in the papers in question." The questioning disclosed: "One of the jurors read all of them, and four read some of them." At that juncture, according to the decision of the circuit court of appeals, defendant's counsel said to the court:

> "I am put in an exceedingly delicate position, and so is the defendant. He says that in the face of the assurance that is given by the jury he does not feel as if he ought to press for the withdrawal of a juror. Of course, he could not say anything else. But it puts me, and it puts him, and it puts the jury, in an exceedingly delicate position. And we are in the hands of the court."

In sustaining the ruling of the district court which denied the motion for withdrawal of a juror, the circuit court of appeals said:

"While it was within the discretion of the trial judge to withdraw a juror and continue the case, he was certainly not required to do so in the face of the declaration by the jurors who had read the articles that they would have no influence with them in arriving at a verdict."

From *Shafer v. Kansas City R. Co.,* (Mo. App.) 201 S. W. 611, we quote:

"There is no proof that plaintiff or her counsel were in any way concerned in the publication thereof or inspired it. No showing was made that the two jurors who read it were influenced by it in any way, and the examination of said jurors showed that they were not influenced by it and in reading it they had done so casually and had paid it but little attention. We do not think the court abused its discretion in refusing to discharge the jury. Partello v. Missouri Pacific R. Co., 240 Mo. 122, 133, 145 S. W. 55."

From *Collins v. Dunbar,* 131 Me. 337, 162 Atl. 897, the following is taken:

"Another exception is to the refusal of the presiding Justice to direct a mistrial. On the third day of the trial certain newspaper articles appeared which commented on the fact that there had been verdicts in favor of the plaintiffs in a previous trial, and contained, according to the defendant's contention, inaccurate recitals of the evidence being taken out in the trial then under way. The presiding Justice examined the jurors in regard to the newspaper articles. Four of them had read them, one of whom said that he read the articles to review the evidence. Each of the jurors, however, claimed that he was in no way influenced by what he had read. The Court gave an appropriate warning to the jurors that they must not read newspaper accounts

of the trial, and impressed on them the importance of keeping their minds absolutely open on the questions at issue. The Court refused at the same time to grant the defendant's motion for a mistrial. Such ruling was a matter of discretion, which seems to have been properly exercised in this instance.''

In *Wilson v. Consolidated Dressed Beef Co.*, 295 Pa. 168, 145 Atl. 81, the court said:

"During the trial, the Evening Bulletin, a public newspaper in Philadelphia, contained some account of the case, including the amount ($75,000) named in Mrs. Wilson's statement of claim. The next morning the matter was called to the attention of the trial judge, when four of the jurors said they had read the article, but that it would not influence their verdict. The trial judge cautioned the jury to entirely disregard it, but refused to withdraw a juror and continue the case. This was a matter largely within his discretion, which was wisely exercised. See, Com. v. Valverdi, 218 Pa. 7, 66 A. 877, affirming 32 Pa. Super. Ct. 241; Com. v. Grotefend & Haun, 85 Pa. Super. Ct. 7. Except where the publication is of a very damaging character, or inspired by a party to the suit, of which there is not the slightest suggestion here, it would form an unfortunate precedent to make it the basis of a mistrial. Jurors must and doubtless can be depended upon to try cases according to the evidence, regardless of casual statements in the daily press.''

In *Kelley v. Dickerson*, 213 Ind. 624, 13 N. E. (2d) 535, a newspaper published an article on the first day of the trial which stated that the defendant was insured and that the insurance company would pay any judgment that might be recovered. The defendant promptly moved for a mistrial. Thereupon the presiding judge questioned each juror concerning the article and discovered that one of the jurors read the

entire article and three read parts of it. Each declared that he would not be influenced by what he had read. The motion was denied. That evening the same paper published another article concerning the defendant's insurance. The next day the defendant renewed his motion. It too was denied. In sustaining the judgment, the decision said:

"The jury was told that it was their duty to determine the rights and liability of the parties as individuals, without any consideration whatsoever as to whether either one of them carried insurance. Under this situation the court, on appeal, cannot say that reversible error was committed."

For a review of additional authorities, see the annotation 86 A. L. R. 935.

As we have seen, the newspaper accounts in the instant case mentioned the homicide, the place where it was committed, and the principals concerned in it. They described the defendant as an ex-convict and declared that Kerr was shot four times as he attempted to flee. Those were the only material items that were mentioned. The evidence was in harmony with all of those statements, provided all four, and not merely three, of the shots were fired while Kerr was endeavoring to get away from his assailant. The shirt, the coat, the photograph of the latter, and Dr. Beeman's testimony, as well as that of some witnesses who saw all, or at least a part of, the shots fired was before the jury. The error in the newspaper account—if, in fact, it is an error—is so minor that the defendant's brief does not mention it.

The newspaper accounts were not sensational and were far removed from the front page. They had none of the characteristics of those described in the de-

cisions upon which the defendant relies and which resulted in retrials.

 As we have seen, the defendant's motion for a mistrial was addressed to the discretion of the trial judge. The latter, before ruling upon the motion, satisfied himself through interrogation of the jurors that the articles had not made any impressions which could not be ignored. It will be remembered that this incident developed near the early stages of the trial. Had the jurors read similar newspaper accounts before they were examined on their voir dire examination, and upon being examined had made answers similar to those which they gave when the motion for a mistrial was pending, it would not have been necessary to have sustained a challenge for cause: *State v. McDaniel,* 39 Or. 161, 65 P. 520; *State v. Savage,* 36 Or. 191, 60 P. 610, 61 P. 1128; 31 Am. Jur., Jury, p. 669, § 152. As a result of the answers made by the jurors upon the questioning, the trial judge, in the exercise of his discretion, refused to declare a mistrial. Had he entertained reasonable doubts he would have ruled otherwise. We realize that the interruption of a trial on account of an incident of this kind and the questioning attendant upon it may have an effect upon the jurors. But the twelve persons who sat in the defendant's case, like all other jurors, took an oath that they would return a true verdict according to the law and the evidence. According to our Constitution, jurors are selected from the most competent of the permanent citizens of the county. The presiding judge was in the midst of the situation and was familiar with the atmosphere of the trial. We know of no reason for holding that he erroneously exercised his discretion when he refused to declare a mistrial. When the state charges a person with a crime, it does

not undertake to provide him with a trial free from error or untoward incidents. All concerned in a trial are human, and that being true, may make mistakes. Hence, an undertaking to conduct a trial free from error would, in most instances, be impossible of fulfillment. The state's undertaking goes no further than to conduct a trial free from prejudicial error. We do not believe that the newspaper articles prejudiced this defendant, and therefore hold that this assignment of error is without merit.

■ The next assignment of error is based upon a ruling which denied the defendant the privilege of asking Harold Sammons, aforementioned, upon cross-examination, whether he "beat up Pat Gray to make him confess." Before the question was asked, Sammons had described the circumstances of the defendant's arrest and had denied that he threatened to beat the defendant in order to induce a confession. Upon cross-examination, the defendant asked Sammons about a person whose name was Pat Gray and who, the defendant says, was in the same tier of cells in the jail where he was incarcerated. Then came the question: "I suppose you would say no to the question, if you didn't also beat up Pat Gray to make him confess." The objection was sustained upon the ground that the question inquired concerning an irrelevant matter. Next, the defendant's counsel asked the trial judge whether a similar question about another individual by the name of Gerald Powers would meet with a like ruling and received the answer "yes."

The defendant contends that shortly before he was taken to the detective offices upon the occasion when he confessed, Gray was returned to his cell in a badly mauled condition and told the defendant that the de-

tectives beat him in order to force him to confess guilt to a crime with which they charged him. The defendant claims that he became fearful that he would receive a similar beating, and confessed. He further contends that the court reporter's notes, which we have previously mentioned, are only in part the defendant's words and that the balance was dictated by the detectives to the reporter whenever the defendant "disrecollected" the "story" he made up for the officers the preceding night. In this manner the defendant seeks to show that the confession should have been rejected by the jury.

The defendant, without objection, testified:

"The next night they took me out and I told them I wasn't the man that done that murder, so they took me back to the cell about 11:00 o'clock, then they put another white fellow in my cell and scared me. This white fellow, they beat him up and put him in the cell; he was all beat up."

After saying that the name of the man was Pat Gray, the defendant continued:

"So I said, 'What's the matter? Have you been in a car accident?' His mouth was bleeding and his nose puffed out. And he took off his shirt and showed me his back where the officers beat him up, and his back was all bloody."

Next, the defendant swore that Gray told him that the detectives gave him the mauling in order to exact a confession from him, and that Gray further said: "They will beat you pretty near to death." A few minutes later, according to the defendant, the detectives took him to their headquarters where they asked him why he killed Kerr. We quote again from his testimony:

"I answered, I said, 'I didn't shoot Kerr.' So they got up and talked with each other and

whispered to each other. They went out and came back with a rubber hose, and both of them had,—pulled blackjacks out, and said, 'We have been talking to you nice and treating you nice, and we can be as nice as you want us to be or we can be as rough as you want us to be. Now, if you don't want to get beat half,—near to death you better come in and kick in and give us this story.' ''

The defendant said that he thereupon confessed, adding, ''I would have took the beating if it didn't be for my head'', which was operated upon some years back, according to him.

Gray, who at the time of the defendant's trial was undergoing trial in another department of the circuit court upon a felony charge, testified in behalf of the defendant:

''I came back up and I was showing this colored fellow,—and I said to him, 'You are in a pretty bad fix.' 'Well, I don't know,' he says. I says, 'Didn't you bump off, about the middle of August, five or six men? Didn't you shoot five or six fellows?' I said. And he said, 'No, I didn't do any such damn thing,'—he wouldn't talk to me. So I took off my shirt and everything and showed him my body. I said, 'When they get through with you, brother, they will beat all the black off of you.' That is all I said.''

He claimed that he showed the defendant marks upon his body and told him that they were inflicted by a rubber hose wielded by the detectives.

The state offered no testimony whatever upon that subject except the officers' testimony that the confession was voluntary, that they made no threats to the defendant, and copies of judgments of conviction in felony cases entered against the defendant and similar judgments entered against Gray. None of the officers resumed the stand after Gray testified.

The defendant contends that he should have been permitted to ask Sammons, upon cross-examination, whether he beat Gray and the aforementioned Powers in order to gain confessions from them.

The material issue was whether the defendant confessed because (1) Gray exhibited to him his wounds; (2) Gray told him that the officers inflicted those wounds; and (3) he, the defendant, believed what Gray said. It could have made no difference whether the purported wounds were incurred through falling downstairs, in a fight, in an automobile accident or in some other manner. If (a) there were wounds upon Gray's body; (b) Gray exhibited them to the defendant; (c) Gray, truthfully or falsely, told the defendant that the officers inflicted them in order to force a confession; and (d) the defendant believed Gray and, believing, confessed; then, the confession should have been rejected. Thus, the material issue did not hinge upon anything that Sammons did or said, but upon what Gray said and the defendant believed.

Section 2-226, O. C. L. A., confines the reception of evidence to the material and relevant issues. It says:

"Collateral questions shall therefore be avoided."

See Wigmore on Evidence, 3d ed., § 39. Section 2-226 permits inquiries into collateral matters when such inquiries will affect the credibility of the witness. The defendant cites several decisions which hold that questions are permissible upon cross-examination concerning irrelevant matters if the answers will show hostility upon the part of the witness against the party affected by the testimony. We can not understand how a beating administered by Sammons upon Gray—as-

suming that one was administered—would show that Sammons was hostile to the defendant. It is our belief that the ruling sustained an objection to an irrelevant question and that, therefore, no error was committed.

█ The eighth, being the last, assignment of error attacks a ruling which received as evidence copies of three judgment orders entered against the aforementioned Gray in felony cases. One of the judgment orders was entered in an Oregon court and the other two were entered in California courts. In support of this assignment of error, the defendant says:

> "When witness admits in cross-examination the crimes for which he had been convicted, it is improper to permit impeachment when there is nothing to impeach, the witness having admitted everything the record tended to prove."

Without subscribing to that proposition, it suffices to state that Gray did not admit the convictions. He was asked nothing whatever upon that subject. This assignment of error is without merit.

The above disposes of all contentions advanced by the defendant. We find no merit in any of them. We have not mentioned every authority cited in his brief, but all of them have been examined.

Out of consideration for those who were kin to, or friend of, the deceased, we add that when we quoted the last words of Kerr, as attributed to him by the defendant, we did so without intimation that we accepted the defendant's testimony as truthful. What brought Kerr into contact with the defendant was known only to the two of them and their Maker. We quoted the defendant's version because that is all that is available.

The judgment of the circuit court is affirmed.